UNITED ARTISTS TELEVISION, INC.,
Plaintiff,

v.

FORTNIGHTLY CORPORATION,
Defendant.

Civ. A. No. 60-2583.

United States District Court
S. D. New York.
May 23, 1966.

Phillips, Nizer, Benjamin, Krim & Ballon, New York City, for plaintiff; Louis Nizer, Gerald Meyer, Gerald Phillips, Herbert N. Bobrow, Donald J. Wollins, John Daly, New York City, of counsel.

Cleary, Gottlieb, Steen & Hamilton, New York City, Smith & Pepper, Washington, D. C., for defendant; Robert C. Barnard, R. Michael Duncan, E. Stratford Smith, Washington, D. C., of counsel.

Rosenman, Colin, Kaye, Petschek & Freund, New York City, for amicus curiae Columbia Broadcasting System, Inc.; Samuel I. Rosenman, Sydney M. Kaye, Asa D. Sokolow, Joseph W. Gelb, New York City, Leon R. Brooks, Washington, D. C., and Philip E. Silberberg, New York City, of counsel.

Marshall, Bratter, Greene, Allison & Tucker, New York City, for amicus curiae Calvada Productions; Royal E. Blakeman and Charles H. Miller, New York City, of counsel.

Alexander & Green, New York City, for amicus curiae Jack Chertok Television, Inc.; Eugene Z. Du Bose, New York City, of counsel.

Graubard & Moskovitz, New York City, for amicus curiae Dena Pictures, Inc.; Seymour Graubard, New York City, of counsel.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for amicus curiae American Society of Composers, Authors and Publishers; Herman Finkelstein, Simon H. Rifkind and Jay H. Topkis, New York City, of counsel.

William B. Haughton, Los Angeles, Cal., Gen. Counsel, Directors Guild of America, Inc., amicus curiae.

William Berger, San Francisco, Cal., Gen. Counsel, Screen Actors Guild, Inc., amicus curiae.

## Opinion

HERLANDS, District Judge:

This action for infringement of plaintiff's copyrights in moving pictures by defendant's community antenna television (CATV) systems in Clarksburg and Fairmont, West Virginia poses novel questions involving interpretation of certain provisions of the Copyright Act, 17 U.S.C. § 1 et seq.[1]

In a general sense, this litigation is a commentary on the current scientific and technological revolution whose manifestations in the field of electronics in-

1. The provisions of the Copyright Act involved herein are:
"§ 1. Exclusive rights as to copyrighted works
Any person entitled thereto, upon complying with the provisions of this title, shall have the exclusive right:
(a) To print, reprint, publish, copy, and vend the copyrighted work;
\* \* \* \* \*
(c) To deliver, authorize the delivery of, read, or present the copyrighted work in public for profit if it be a lecture, sermon, address or similar production, or other nondramatic literary work; to make or procure the making of any transcription or record thereof by or from which, in whole or in part, it may in any manner or by any method be exhibited, delivered, presented, produced, or reproduced; and to play or perform it in public for profit, and to exhibit, represent, produce, or reproduce it in any manner or by any method whatsoever. The damages for the infringement by broadcast of any work referred to in this subsection shall not exceed the sum of $100 where the infringing broadcaster shows that he was not aware that he was infringing and that such infringement could not have been reasonably foreseen; and
(d) To perform or represent the copyrighted work publicly if it be a drama or, if it be a dramatic work and not reproduced in copies for sale, to vend any manuscript or any record whatsoever thereof; to make or to procure the making of any transcription or record thereof by or from which, in whole or in part, it may in any manner or by any method be exhibited, performed, represented, produced, or reproduced; and to exhibit, perform, represent, produce, or reproduce it in any manner or by any method whatsoever \* \* \*."

clude such forms of mass communication as television over the air—commonly known as TV—and wire television or cable-TV [2]—one phase of which is CATV.

In a legalistic sense, this case requires the application of traditional judicial techniques of statutory construction to give specific words in Section 1 of the Copyright Act a meaning that will accommodate the underlying legislative purpose and the realities of modern communications technology.

For the reasons expounded in this opinion, the court decides that defendant is liable for infringing plaintiff's exclusive performing rights in the copyrighted works that are the subject matter of this litigation.

This opinion contains the findings of fact and conclusions of law required by Fed.R.Civ.P. 52(a).

Two preliminary observations will place the issues and the record in sharper focus. The term "community antenna," as used by defendant for self-description, is a misnomer and reflects a fundamental misconception. Defendant's two systems are not "community" ventures. They are large-scale commercial enterprises, advertising and promoting television programs, and making profit out of the exploitation of television programs, including plaintiff's copyrighted motion pictures. Nor are defendant's operations simply that of passive "antennas" used only to receive telecasts. In fact, defendant's two systems, among other processes, receive, electronically reproduce and amplify, relay, transmit and distribute television programs—operations requiring complex, extensive and expensive instrumentation. These systems function as wire television systems, only one of whose structural components consists of antennas.

Most of the evidentiary facts are not in dispute.[3] The parties disagree fundamentally, however, as to the characterization of the evidence, the operative facts and the legal conclusions. To take the most salient example: the electronics experts for both sides agree on the relevant television technology; and the parties themselves do not controvert any of the other basic technological facts, such as the manner in which defendant's electronic instrumentation functions. Plaintiff and defendant, however, argue for diametrically opposed conclusions from those facts.

Because the evidence is technical and this case presents important questions of first impression, the court will express its findings and conclusions in more than customary detail.

I.

*The complaint*

The amended complaint (hereinafter "complaint"), filed January 24, 1964, alleges defendant's ownership and operation of "two community television systems," one located in and about the city of Clarksburg, West Virginia, and the other in and about the city of Fairmont, West Virginia. (Paragraph "4"). The complaint describes the physical structure, electronic instrumentation and operation of the systems. In this description, the complaint states that defendant's systems "receive and reproduce television signals emanating * * * from television broadcasting stations located in the cities of Pittsburgh, Pa., Steubenville, Ohio and Wheeling, West Virginia"; that the "television signals so received and reproduced * * * are then distributed by defendant by means

---

2. For the use of "wire television" see, e. g., Hearings, Subcommittee No. 3, House Committee on the Judiciary, 89th Cong., 1st Sess., at pp. 1342, 1345–48 (1965) (reprinting address by Frederick W. Ford, Commissioner, Federal Communications Commission). For use of "cable-TV" see, e. g., Note, 79 Harv.L.Rev. 366, 368, 378 (1966).

3. Defense counsel stated: " * * * in my view the underlying facts in this case are in a very real sense not in dispute. We have stipulated as to equipment, et cetera. The question is, what words do you apply to the service which we render to our subscribers?" (Trial Record at 108.)

of cables connected to the homes, residences and places of business of defendant's subscribers in and about" Clarksburg and Fairmont, "against payment by said subscribers of an initial hook-up fee and a monthly service fee to defendant." (Paragraph "5").

The complaint particularizes (paragraphs "6"–"15") plaintiff's exclusive rights as the copyright owner of a large number of copyrighted "motion picture photoplay films," material details in connection therewith being set forth in voluminous exhibits attached to the complaint. Among plaintiff's exclusive rights enumerated in the complaint (paragraph "15") is "the exclusive right to license the exhibition and telecasting" of the listed moving pictures "to television stations," "authorizing them to telecast such motion pictures in their coverage area." It is alleged that the amount of plaintiff's compensation derived from such licensed television stations "depends to a large extent on the size of the television audience for said motion pictures in the local coverage area of the licensee, but not outside thereof."

The complaint (paragraphs "16"–"27") sets forth, as follows, the names and channel numbers of five television stations with whom plaintiff entered into limited license agreements covering a specified number of telecasts of certain listed motion pictures and providing "for free home reception and for no other use or purpose":

| | |
|---|---|
| KDKA Pittsburgh | channel 2 |
| WTAE Pittsburgh | channel 4 |
| WIIC Pittsburgh | channel 11 |
| WSTV Steubenville | channel 9 |
| WTRF Wheeling | channel 7 |

The complaint then charges (paragraphs "28"–"31") that, "by means of its television systems," without license or authority, defendant "did receive, reproduce and distribute in such reproduced form to its subscribers, the television broadcasting signals emitted by" the five above-mentioned television stations, "carrying telecasts" of plaintiff's copyrighted motion pictures, as listed in the complaint; that, by reason of such acts, "defendant did publicly exhibit, perform, represent, produce, reproduce, copy, publish and vend, by means of its television systems, said motion pictures to its subscribers, * * * all of which constituted an infringement" of plaintiff's copyrights; and that defendant's acts "pertaining to each telecast of plaintiff's copyrighted motion picture photoplay films gives rise to a separate claim under the Copyright Act against the defendant with respect to each such telecast." The exhibits attached to the complaint list the respective infringement dates.

The complaint (paragraph "34") also charges defendant with "unfair trade practices and unfair competition."

For relief, plaintiff seeks an injunction, damages, an accounting, costs and attorneys' fees.

*The answer*

The answer, filed April 1, 1964, is divided into seven parts. The first part contains, *inter alia*, denials of most of the material facts upon which plaintiff predicates its infringement claims. Defendant refers to each of its systems as "a community antenna system" and a "community antenna system for television reception" (paragraph "4"), "the function of which is the wholly passive one of responding to the energy of broadcast waves which strike it." (Paragraph "5"). Defendant denies engaging in "the performance, exhibition, production, reproduction, representation or publication of motion pictures or any program or advertising" (paragraph "5") and denies the allegations of the complaint charging infringement, unfair trade practices and unfair competition (paragraphs "28"–"35").

The second part (paragraph "36") alleges the defense that plaintiff "has failed to state a cause of action upon which relief may be granted."

The third part (paragraphs "37"–"38"), quoted at length below, alleges the separate defense that plaintiff seeks by this action "to impose an unlawful

charge upon the reception by defendant's subscribers of broadcasts by commercial television" in contravention of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151–609 (1964), as implemented by regulations of the Federal Communications Commission.

The fourth part (paragraph "39(a)"– "39(e)") pleads five separate defenses: (a) that "all of the motion pictures referred to in the Amended Complaint are in the public domain and unprotected by copyright having been publicly performed and published with the authority of the copyright proprietor without notice of copyright having been affixed thereon in conformity with law"; (b) that there is a failure to state a cause of action for those infringements "for which no date of infringement is alleged"; (c) that plaintiff is guilty of laches; (d) that plaintiff's claims are barred by waiver and estoppel; and (e) that, if plaintiff licensed the five above-named television stations to broadcast the said motion pictures, "then defendant's subscribers are licensed to receive such broadcasts by means of defendant's community antennas and defendant is licensed to furnish its community antennas to its subscribers for such reception."

The fifth part (paragraphs "40"– "45") pleads separate defenses of misuse of copyright. The sixth part (paragraphs "46"–"47") pleads the separate defense of the statute of limitations. The seventh part (paragraphs "48"– "50") pleads a separate defense to plaintiff's non-copyright claims.

*Pre-Trial Order Number One*

On June 29, 1965, in Pre-Trial Order Number One, this court ordered that the trial of the action proceed in four designated stages; that the basic issue of copyright infringement be tried first; and that all defenses other than the separate defense pleaded in paragraphs "37" and "38" of the answer be reserved and tried in subsequent stages.

Other material parts of said order are not referred to at this time.

*Pre-Trial Order Number Two*

The issues to be tried at the first stage of the trial were formulated by the court in its Pre-Trial Order Number Two, dated February 7, 1966, as follows:

"1. Whether there is an infringement of copyright by reason of reception of (or other, if any, activity of the defendant in relation to), a telecast by means of the community antenna television system owned by the defendant within the meaning of 17 U.S.C. § 1(a) (c) and (d), as indicated in paragraph 5 of the Amended Complaint and the Answer thereto as formulated in Pre-Trial Order No. 1, paragraph II, (as amended by Pre-Trial Order No. 2, par. VII) together with defendant's Third Separate Defense.

"2. Third Separate Defense:

Commercial television broadcasting, like that of the broadcasting stations referred to in the Complaint, is governed by the Communications Act of 1934, as amended, 47 U.S.C. § 1, et seq., as implemented by regulations promulgated by the Federal Communications Commission, and under the Act so implemented no person may lawfully impose charge upon the reception of commercial television broadcasts and every person is free to receive such broadcasts by the equipment of his choice. (Paragraph 37 of the Answer.)

"Since the stations alleged to have broadcast the motion pictures listed in the Exhibits annexed to the Complaint did so, if at all, pursuant to license from the plaintiff and pursuant to license from the Federal Communications Commission, which latter license precludes a charge to the public for the reception of the broadcasts, the plaintiff seeks by this action to impose an unlawful charge upon the reception by defendant's subscribers of broadcasts by commercial television, and may not recover. (Paragraph 38 of the Answer.)"

*Jurisdiction*

Pursuant to 28 U.S.C. § 1338(a), this court has jurisdiction of the subject matter of this action which arises under the Copyright Act, 17 U.S.C. § 1 et seq., as

amended. This court has jurisdiction of the parties hereto.

*Parties' assumptions as to plaintiff's copyrights, motion picture telecasts, and defendant's reception of telecast signals*

For the purpose of the first stage of the trial of this action, the parties have formally assumed the following facts *inter alia:* that plaintiff is the owner of valid copyrights in certain motion pictures; that some of said motion pictures are photoplays (classified as LP's on the copyright certificates) and that others are not photoplays (classified as MP's on the copyright certificates); that these motion pictures were telecast by the above-mentioned five television stations in Pittsburgh, Wheeling, and Steubenville, pursuant to license contracts between plaintiff or plaintiff's predecessor in title and said television stations; that the signals of these television stations were received by and made available on defendant's systems; that the five television stations in Pittsburgh, Wheeling and Steubenville did telecast the motion pictures licensed to those stations by plaintiff or plaintiff's predecessor in title; that the AM carrier waves and FM carrier waves into which those motion pictures were transduced in order for them to be telecast [4] were received by defendant's systems; and that audio and video signals representing the intelligence contained in those carrier waves were then made available by defendant to its subscribers.

For the purpose of the first stage of the trial, defendant concedes [5] that it did not enter into any license agreement with plaintiff with respect to any of the motion pictures in suit which were telecast by the stations in Pittsburgh, Wheeling and Steubenville.

*Charge of infringement limited to defendant*

At the outset, it should be pointed out that plaintiff has stipulated (1) that it does not contend that the broadcasting stations are guilty of copyright infringement by reason of the telecasts, which were authorized by the respective license agreements; and (2) that it does not contend that any of the homeowners who received any of the telecast programs are guilty of copyright infringements.

*Plaintiff and the motion pictures in suit*

Plaintiff, United Artists Television, Inc. (formerly known as United Artists Associated, Inc.), a Delaware corporation, is a wholly owned subsidiary of the United Artists Corporation, also a Delaware corporation.

Effective as of October 17, 1958, United Artists Television, Inc. (then known as United Artists Associated, Inc. and hereinafter sometimes referred to as UATV or plaintiff) acquired the assets of Associated Artists Productions Corp. (hereinafter AAP), which included certain rights in the motion pictures in suit. Among the assets of AAP acquired by plaintiff were license agreements with respect to the motion pictures in suit with television stations in Pittsburgh, Wheeling and Steubenville.

Plaintiff is, and, since October 17, 1958, has been engaged in the business of distributing and licensing the motion pictures in suit, and other motion pictures to television stations.

Plaintiff's predecessor in title (AAP, or AAP Inc. as its distribution agent) and plaintiff entered into contracts with television stations in Pittsburgh, Wheeling and Steubenville, with reference to the telecasting of the motion pictures involved in this action. Such motion pictures as were telecast by such stations and as are claimed to have been infringed

---

4. The relevant television technology, critically essential for the resolution of the basic copyright issue, is explained below in the course of this opinion.

5. Defendant contends, however, that there is a license implied in law, an issue raised by its third affirmative defense and encompassed in the first stage of the trial by virtue of the pretrial orders herein.

by defendant were listed in said contracts with the respective television stations.

*Provisions of plaintiff's contracts with the Pittsburgh, Wheeling and Steubenville television stations*

In all of the contracts whereby plaintiff or its predecessor in title licensed the said television stations to exhibit the motion pictures in suit, it was provided, in substance, that the licensor granted a limited license under copyright to exhibit the pictures over the facilities of the television station and for no other use or purpose.

In most of the contracts whereby plaintiff or its predecessor in title licensed the said television stations to exhibit the motion pictures in suit, it was expressly provided, in substance, that the license granted shall be limited to the exhibition of the pictures over the facilities of the station licensed, unless specific provision was made for the right of the station to exhibit the pictures over the facilities of additional stations or networks, by simultaneous transmission, relay broadcast or otherwise.

In some of the contracts whereby plaintiff or its predecessor licensed the said television stations to exhibit the motion pictures in suit, it was specifically provided, *inter alia*, that none of the pictures was to be broadcast or exhibited over community antenna systems.

The primary purpose of the clauses in the licensing agreements with the Pittsburgh, Wheeling and Steubenville television stations limiting telecasting by those stations only over the facilities of the particular stations was to make it clear that the licensed stations had no right to sublicense community antenna systems authorizing them to pick up the programs licensed.

The licenses granted by plaintiff to the television broadcast stations authorizing the broadcast of plaintiff's copyright material contained the following limitations, *inter alia*: to broadcast only by the use of the effective radiated power at the time of the granting of the license; that the station could not grant subli-

censes and could use only its own facilities; that telecasts would be solely with the station's own facilities for gratuitous reception by the public.

*Defendant's business background and general operations*

Defendant, Fortnightly Corporation (sometimes referred to hereinafter as Fortnightly or defendant), is a Delaware corporation. Effective September 30, 1960, its name was changed from the NWL Corporation to Fortnightly Corporation. Defendant is, and has been, engaged in other businesses, in addition to its operation of the two wire television systems involved herein.

On March 13, 1957, defendant acquired all of the stock of the Clarksburg Television Cable Corporation, a West Virginia corporation, at a contract price of $879,000. The sole business of the Clarksburg Television Cable Corporation was the operation and maintenance of a community antenna system in and around Clarksburg, West Virginia. On May 14, 1957, the Clarksburg Television Cable Corporation was liquidated and its assets transferred to, and its liabilities assumed by, defendant. Thereafter, defendant owned and operated the community antenna system in and around Clarksburg as a division of defendant under the name of Clarksburg TV Cable Co.

On January 31, 1958, defendant acquired all of the stock of the Consolidated Television Cable Corporation at a contract price of $313,457. This corporation owned, maintained and operated as its sole business a community antenna system in and around Fairmont, West Virginia and a second community antenna system in and around Bluefield, West Virginia. Prior to November 13, 1956, the community antenna television system in Bluefield, West Virginia, was owned by the Bluefield TV Cable Corporation.

· On November 13, 1956, the Fairmont Television Cable Corporation was merged with and into the Bluefield TV Cable Corporation, and on December 1, 1956, the name of the Bluefield TV Cable Cor-

poration was changed to Consolidated TV Cable Corporation, the same corporation acquired by defendant on January 31, 1958.

On December 23, 1958, the Consolidated Television Cable Corporation sold all of the assets of the Bluefield community antenna system for a price of $32,-000. Thereafter, the Consolidated Television Cable Corporation, which owned, maintained and operated only the Fairmont community system, was liquidated as of July 31, 1959. Its assets were transferred to, and its liabilities assumed by, defendant, who thereafter owned, maintained and operated the community antenna system in and around Fairmont as a division of defendant under the name of Fairmont TV Cable Co.

On December 31, 1963, defendant transferred all of the assets of the Fairmont TV Cable Co. division to its wholly-owned subsidiary, Fairmont TV Cable Co., Inc., a West Virginia corporation, which assumed the liabilities of defendant for performance under the contracts and agreements of the antenna system and trade accounts with respect to this antenna system. Thereafter, this wholly-owned subsidiary owned, maintained and operated the Fairmont community antenna system.

*Location of defendant's systems*

The community antenna system in and around Clarksburg was built by, or caused to be built for, the Clarksburg Television Cable Corporation in 1953. The subscribers to the Clarksburg community antenna system are located in and around Clarksburg and the surrounding communities of Bridgeport, Nutter Fort, Stonewood, Anmoore and Edgewood.

The community antenna system in and about Fairmont was built by, or caused to be built for, the Fairmont Television Cable Corporation in 1953. The subscribers to the Fairmont antenna systems are located in and around Fairmont and the surrounding communities of Barracksville and Watson.

Clarksburg is located approximately 82 miles from Pittsburgh; approximately 57 miles from Wheeling; and approximately 74 miles from Steubenville.

Fairmont is located approximately 67 miles from Pittsburgh; approximately 52 miles from Wheeling; and approximately 65 miles from Steubenville.

Clarksburg is located approximately 18 miles from Fairmont.

The above distances are air distances, measured from the approximate center of each community.

Clarksburg and Fairmont are beyond the radio horizon of all of the television stations in Pittsburgh, Wheeling and Steubenville.

The roughness and the increase in elevation of the terrain beyond the two-to ten-mile zone from Pittsburgh, Wheeling and Steubenville to Clarksburg (which terrain is rougher than the average terrain of the United States) attenuates the intensity of the propagated carrier waves because mountains and hills create obstructions to television transmission, and rough terrain causes a scattering and absorption of the electromagnetic energy. These factors adversely affect the quality of television reception in Clarksburg.

In both Clarksburg and Fairmont, there are sharp drops in elevation from defendant's antenna sites to the more densely populated areas of both cities. In Clarksburg, the antenna site is 210 feet higher than the highest point within the city and at least 720 feet higher than the lowest elevation within the city. In Fairmont, the antenna site is 263 feet higher than the highest point in the city and at least 723 feet higher than the lowest elevation within the city. Most of the homes in Clarksburg and Fairmont are located in valleys. Fairmont itself is very hilly and is surrounded by higher ridges and hills.

*Commercial aspects of defendant's business*

Defendant's systems were and are operated as businesses for profit. Defendant's obligation to its subscribers was to deliver, provide and make available tele-

vision programs for which the subscribers paid a fee.

Members of the public residing in and around Clarksburg and Fairmont became subscribers to the respective systems by entering into contracts with defendant on contract forms provided by it and by making payments to it as required by the contracts. The systems charged various rates for making available the television programs by processing and transmitting broadcast television signals. The contracts specifically provide that defendant would not be liable if a television station should fail to broadcast. An initial charge was made to connect a subscriber's set to the system even in cases where the connection was already in place. A subscriber was not permitted to install additional outlets and was not allowed to connect additional sets to the system, except on the payment of additional charges for such additional outlets and sets. Non-residential premises, having a potentially larger number of viewers, paid, at times, a higher initial charge and a greater monthly charge than did residential premises.

Defendant operates its Clarksburg system in the city of Clarksburg and the towns of Bridgeport, Anmoore, Nutter Fort and Stonewood, pursuant to municipal franchises reciting that they were granting it rights of way for the purpose of erecting and operating a system of distributing and relaying television broadcasts. Defendant operates its Fairmont system pursuant to a municipal ordinance of the town of Fairmont reciting that it was granting it rights of way for the purpose of erecting and operating a television cable service.

Defendant and its predecessors promoted, vended and distributed programs to their subscribers. By means of newspapers, radio and by direct mail, they advertised the variety of programs transmitted; that their subscribers had a choice of more than one station at a time; that the choice of all three networks' programs was available only to their subscribers; that only with the cable could clear, steady, vivid, snow-free pictures be obtained; and that certain programs transmitted from Pittsburgh, Wheeling and Steubenville could be seen only on the cable.

Defendant advertised that, without subscribing to its system, homeowners in Clarksburg were "chained to one channel," i. e., they could view only the programs of the one local channel then on the air. Defendant advertised that only as a subscriber to its Fairmont system could a variety of programming and a choice of shows be obtained in Fairmont.

Defendant's activities in promoting and advertising television programs on its cables were similar to the promotional and advertising activities of a television broadcasting station. Moreover, defendant competed with the local television station and vied with programming much in the same way that television broadcasting stations compete with one another by means of the programs they offer.

*The need for defendant's wire television systems*

The "geographic-electronic problem" created by the mountains between Clarksburg and Fairmont and the television stations in Pittsburgh, Wheeling and Steubenville and the other physiographic conditions in that area materially block normal television reception in Clarksburg and Fairmont of broadcasts from those television stations.

No credible competent evidence was adduced which demonstrated that the residents of Clarksburg or Fairmont, other than the subscribers to defendant's systems, could receive a usable and reasonably satisfactory picture from any of the five television stations in Pittsburgh, Wheeling or Steubenville. Without subscribing to defendant's systems, the residents of Clarksburg and Fairmont could receive through their home antennas a usable and reasonably satisfactory picture only from the local Clarksburg and Fairmont (Weston) television stations.

The distances between the Clarksburg-Fairmont area and Pittsburgh, Steuben-

ville, and Wheeling, and the roughness of the intervening terrain are such as to render reception of the signals from Stations KDKA, WIIC and WTAE in Pittsburgh, Station WSTV in Steubenville and Station WTRF in Wheeling unsatisfactory on ordinary home antennas in Clarksburg and Fairmont.

The Fairmont system publicly demonstrated the superiority of the signals transmitted by its systems over signals obtained directly off the air by a homeowner by playing two television sets tuned to the same channel side by side in its showroom, one connected to a roof top antenna and one to the CATV system. As compared to the picture on the set connected to the CATV system, the picture on the set connected to the rooftop antenna was of poor quality, and there was "snow" on that picture.

*Statistics concerning defendant's subscribers*

In 1963, the Clarksburg system had more than 9,500 subscribers. In 1960, the Clarksburg system had almost 8,000 subscribers, consisting of approximately 72 per cent of all occupied housing units in the area in which defendant's system operated. The United States Census of Housing, 1960, for West Virginia, shows that the total occupied housing units in Clarksburg, Bridgeport, Anmoore, Nutter Fort, and Stonewood was 11,442. In 1959, approximately 73 per cent of the residents of Clarksburg subscribed to defendant's system.

In 1963, the Fairmont system had more that 6,000 subscribers; in 1960, more than 5,000 subscribers; in 1959, almost 5,000 subscribers; in 1958, more than 4,600 subscribers. The United States Census of Housing, 1960, for West Virginia, shows that the total occupied housing units in Fairmont was 9,079. In Fairmont, there were approximately 6,500 homes in 1958 and 1959 according to the municipal assessor.

The approximate number of the subscribers to defendant's community antenna systems in Clarksburg and Fairmont, as of December 31 of the years designated, was as follows:

|      | Clarksburg | Fairmont |
|------|------------|----------|
| 1953 | 1779       | 1104     |
| 1954 | 4245       | 2003     |
| 1955 | 6098       | 3065     |
| 1956 | 7415       | 3857     |
| 1957 | 7776       | 4313     |
| 1958 | 7891       | 4621     |
| 1959 | 8280       | 4919     |
| 1960 | 7966       | 5092     |
| 1961 | 7829       | 5160     |
| 1962 | 9075       | 5651     |
| 1963 | 9571       | 6047     |

Of these total numbers of subscribers, approximately 40 in Clarksburg and between 35 to 40 in Fairmont were nonresidential subscribers (e. g., hotel, motel, bar, tavern or pool hall, some of which had more than one outlet) during the years 1957. through 1963. During this period, there were also approximately 20 stores or retail television dealers in Clarksburg which were subscribers, some of which had more than one outlet. These stores and dealers were charged the residential rate. Hotels and motels were considered as one even though there were many taps. One hotel had 175 such taps.

*The operation of defendant's systems*

Each of the defendant's wire television systems requires a permanent staff of highly qualified technicians; intricate and expensive test and maintenance equipment; special tools; continuous preventive maintenance; and an expensive inventory of cable, amplifiers and other spare parts. A system such as each of defendant's systems would require approximately ten to fifteen people to run it.

Each of the systems is designed to receive specific stations and to reject all other stations. The only programs that can be received through defendant's systems are those that the systems are engineered to distribute. Each of the systems is designed and operated to of-

fer the subscribers a variety of the best programming available, without duplication.

At the time of their construction, and until 1958, the equipment utilized by the said systems was such that the programs of only three television stations were transmitted to subscribers. In the fall of 1958, both of defendant's systems were expanded with the result that, as of November 1, 1958, the programs of five television stations were transmitted to subscribers of each system. The following table lists the television stations whose programs were transmitted by defendant on its two systems during the period from their construction through May 1, 1964:

| Station | Clarksburg | Fairmont |
|---|---|---|
| KDKA–TV, Channel 2 Pittsburgh, Pa. | entire period | up to 4/4/64 |
| WTRF–TV, Channel 7 Wheeling, W. Va. | from Dec. 1953 thru entire period | from Dec. 1953 thru entire period |
| WJAC–TV, Channel 6 Johnstown, Pa. | up to July, 1954 | up to July, 1954 |
| WSTV–TV, Channel 9 Steubenville, Ohio | July, 1954 to 4/4/64 | July, 1954 to 5/1/64 |
| WIIC–TV, Channel 11 Pittsburgh, Pa. | 11/1/58 to 12/8/62 | 11/1/58 to 5/1/64 |
| WTAE–TV, Channel 4 Pittsburgh, Pa. | 11/1/58 to 3/1/64 4/4/64 to 5/1/64 | 11/1/58 to 1/3/61 1/28/61 to 3/1/64 4/4/64 to 5/1/64 |
| WBOY–TV, Channel 12 Clarksburg, W. Va. | 12/8/62 to 5/1/64 | |
| WJPB–TV, Channel 5 Weston, W. Va. | 3/1/64 to 5/1/64 | 1/3/61 to 1/28/61 3/1/64 to 5/1/64 |

Defendant took the position that it was an illegal act for anyone to "steal" the signals it transmitted. Defendant initiated a criminal prosecution against a person accused of having "stolen" its signals; and defendant obtained a conviction. Defendant also took the position, expressed in writing, that it was improper for WBOY, the local Clarksburg television station, to engage in "rebroadcasting *programs*" supplied to it by defendant under a subscription contract. (Emphasis added.) Defendant's position was that it was improper for anyone to utilize its system for additional television sets for which the subscriber had not obtained authorization.

Defendant's systems preselected the stations whose programs were provided to its subscribers; and supplied some of said subscribers with programs contrary to their expressed preference, and in some instances, even contrary to the expressed preference of most of the subscribers.

*Origination of television broadcasts*

Television programs originate from any one of the following three sources: (a) a live performance in a television studio or other place of origination; (b) a prior recording of a live performance in the form of magnetic video tape; and (c) a motion picture film. Where the television station serves an affiliated network station (as distinguished from an originating station), the telecasts of the network station are a rebroadcast of the

video and audio signals usually delivered to it by the television stations by means of the cable services of the telephone company.

An understanding of the basic technology of telecasting is prerequisite to the resolution of the critical issue of copyright infringement. What follows is a summary of facts found on the basis of the record evidence herein representing relevant telecasting technology.

The sensing of the video or picture portion of a live performance is effected by a television camera. The scene (the visual program information) to be reproduced is focused optically (by means of a lens system) on a photosensitive surface composed of elements whose electrical properties vary in accordance with the intensity of the light that strikes them. By "scanning" a narrow beam of electrons over this surface, so as to strike each element in a regular sequence, a pattern of electrical current or voltage is formed which varies in proportion to the brightness of the portion of the picture being scanned. The voltage so obtained is at any instant of time a measure of the brightness of the small area of the picture being scanned at that instant. This voltage is known as the "video signal."

The foregoing process by which sight has been converted into its electronic counterpart or replica, the "video signal," is called transduction.

A video signal is a form of electrical energy. However, video signals have an oscillation (frequency) and wave length that do not permit them, by themselves, to be radiated from the television station's transmitting antenna. For this reason and purpose, carrier waves are employed.

Carrier waves have higher frequency and shorter wave length than the video signals. The carrier waves are produced by an oscillator. If broadcast, carrier waves that are not modulated would transmit no information other than the fact that a transmitter is on. Therefore, the carrier waves are subjected to a process of "modulation," whereby video signals (and also audio signals, as will be shown later) are imposed on the carrier waves, which are then said to be modulated.

The carrier waves are modulated by the video signals by feeding the video signals into an amplitude modulator. The output of the amplitude modulator is a reproduction of the video signal in the form of an amplitude modulated carrier (hence "AM carrier wave"), which is suitable for transmission through the air by radiation from the station's antenna. The information or intelligence embodied in the video signal appears as variations in the amplitude of the carrier wave.

In the course of the foregoing processes, the video signal, and the amplitude modulated radio frequency carrier reproduced therefrom, are "amplified" by making reproductions of them at higher intensities, so that at the final stage the amplitude modulated radio frequency carrier can be employed for transmission through the air in the form of an electromagnetic wave.

The sensing of the audio or sound portion of a program is effected by a microphone. Sound manifests itself in rapid pressure variations in the air, which, when they impinge upon the sensitive element of the microphone, cause the sensitive element to vibrate and the microphone to produce a voltage varying in intensity in proportion to the intensity of the sound from instant to instant. This voltage is known as the "audio signal."

The foregoing process by which sound has been converted into its electronic counterpart or replica, the "audio signal," is another illustration of transduction. An audio signal, like a video signal, is a form of electrical energy. Like video signals, audio signals have a frequency and wave length that do not permit them, by themselves, to be radiated from the television station's transmitting antenna. For this reason and purpose, carrier waves are employed.

The audio signals are amplified and used to modulate the frequency of car-

rier waves (hence "FM carrier waves"), which are suitable for transmission through the air by radiation in the form of electromagnetic waves.

The electronic reproductions, i. e., the patterns of electromagnetic energy of the video and audio signals derived from the television camera and microphone, can be stored upon the surface of a magnetic tape. When the tape is run under the readout head of a tape playback unit in the television broadcast station, the unit acts in much the same way as the television camera and microphone in the case of a live performance; so that, by means of amplification and modulation, reproductions of such signals are obtained at higher intensities at radio frequency, which are thereafter transmitted from the station's antenna in the form of electromagnetic waves.

Motion picture film, constituting patterns of different intensities of black and white, or color, on the film are transduced into video signals by projecting their images on a small photosensitive surface within a camera tube, which is then scanned by an electronic beam in the same manner as does the television camera in conjunction with a live scene. Similarly, the variations in the film's sound track are used to obtain an audio signal. Thereafter, the video and audio signals so derived are reproduced by amplification and modulation, so as to obtain modulated radio frequency carriers with sufficient intensity as to be suitable for transmission from the station's antenna in the form of electromagnetic waves. Neither picture nor sound is made visible or audible in the studio as the picture is transduced into video and audio signals.

The term "envelope" represents a concept. It is a mere graphic representation without physical reality. It is a descriptive term used to describe the form or pattern of the modulated video carrier wave if one imagined that over a period of time a line were drawn on a graph of the modulated carrier wave joining the peaks of the changing amplitude of the variations or oscillations of the carrier wave. The "envelope" of the modulated carrier wave is essentially the same in form as that of the video signal used to modulate the carrier wave.

The modulated carrier waves (the video and audio carriers) are reproduced by amplification in the broadcast transmitter and transmitted through a transmission line to the broadcasting station's broadcasting or transmitting antenna. Commonly, the modulated video and audio carriers are combined through a device called a diplexer so that both modulated carriers may be broadcast from the same antenna. If a diplexer is not used, a separate transmitting antenna is used for broadcasting the modulated sound carrier and for broadcasting the modulated video carrier. The broadcasting antenna radiates these modulated carrier waves in the form of electromagnetic energy toward the horizon.

*Defendant's systems: their equipment, operation, function, purpose and over-all engineering design*

Television programs, in the form of electromagnetic waves, may be transmitted to home television sets by any one of the following means: ·

(a) in the case of an originating local station, by direct propagation through the air at radio frequency from the transmitting antenna of the originating television station.

(b) in the case of a network broadcast, from the network's originating studio; first, by propagating the video and audio signals and/or corresponding modulated radio frequency carriers through a system of coaxial cables and microwave links to the network affiliate station; and then, by propagation through the air at radio frequency from the transmitting antenna of such affiliate station.

(c) in the case of a satellite, translator or repeater station, from the originating television station or local station; first, by propagation through the air at radio frequency to the receiving antenna of a satellite, translator or repeater station (a procedure referred to as "off the air pickup"), and then, by propagation at radio frequency through the air from the transmitting antenna of

the said satellite, translator or repeater station; and

(d) in the case of a CATV system, by propagation at radio frequency through its coaxial cables of programs picked up off the air from any one of the different types of transmitters described in subdivisions (a), (b) and (c) above.

Programs in the form of electromagnetic waves are received on defendant's antennas. The antennas for the Clarksburg system are located on Huffman Hill, 1,620 feet above sea level, approximately two and one-half to three miles from the center of Clarksburg. The antennas for the Fairmont system are located on Tennant's Knob, Barracksville, West Virginia, 1,480 feet above sea level, approximately two and one-half miles distant from the center of Fairmont.

The five antenna arrays for the Clarksburg system, consisting of seven antennas, are each supported on a separate pole, 40–50 feet tall.

The antennas for the Fairmont system are mounted on a steel catwalk approximately 25 feet in length, supported by two steel towers of triangular or parallel steel construction approximately 100 feet in height, placed in a concrete foundation. The two towers are guyed by either three or four steel strands which extend approximately 60–70 feet from the antenna, and require between ¼ and ⅓ of an acre.

In Fairmont, for each station received there were the following antennas: for Channels 7 (WTRF), 9 (WSTV) and 11 (WIIC) there were, for each channel, two 10 element yagi antennas; and for Channels 2 (KDKA) and 4 (WTAE) there was, for each channel, a single 10 element yagi antenna.

In Clarksburg, there were five antenna arrays made up of seven antennas as follows: for Channel 4 (WTAE), there were two 5 element yagi antennas in a stack; for Channel 9 (WSTV) there were two 12 element yagi antennas in a stack; for Channel 11 (WIIC) there were four 4 element yagi antennas in two stacks; for Channel 2 (KDKA) and

Channel 7 (WTRF) there were dipole antennas with corner reflectors. The cost of corner reflectors for Clarksburg was $2,000.

Antennas of a type substantially similar to those referred to above have been in use since November, 1958; and, prior to that time, substantially similar antennas were used to receive the signals of the three stations which were made available at that time on defendant's systems.

Defendant's systems utilize antennas specially designed and oriented for optimum reception of each of the five channels carried. The electromagnetic waves which have been received on the antennas travel through coaxial cables from the antennas to a building at the base of the antennas, where the electronic equipment referred to as the "head end equipment" is located.

The basic head end equipment employed by defendant during the period in suit was and is as follows:

(a) Prior to November 1957, each system had two "WCON" converters (a trade name of Jerrold Electronics Corp.) for Channels 7 and 9 and an amplifier for Channel 2;

(b) During the period November 1957 to November 1958, each system had a "Teletrol" unit (a trade name of the Jerrold Electronics Corp.), consisting of a demodulator and a modulator, for Channel 2; and two WCON convertors for Channels 7 and 9;

(c) During the period November 1958 to April or May 1964, each system had for each of the five channels a preamplifier and a "Teletrol" unit; and

(d) After April or May 1964, each system had a "Channel Commander" unit (a trade name of the Jerrold Electronics Corp.) for each of its five channels.

The preamplifiers, the amplifiers, the "WCON" convertors, the "Teletrol" units, the "Channel Commander" units (the last three mentioned instruments being used at various times but not simultaneously), and the line and distributing amplifiers throughout defendant's systems are an assemblage of de-

vices which—by enabling the received signals (voltages) to control a local source of electrical power—produces an enlarged reproduction of the essential characteristics of the received signals (input signals). The operations of the foregoing system of instrumentation, among other effects, modulate, on new carrier waves derived from locally supplied electrical energy, the pattern of variations of the input signals. Thereby, there are created output signals which are replicas in electronic terms of the input signals.

These output signals, while completely new, represent the same video and audio information and intelligence as did the input signals. The signals representing both the video and sound do not move as preserved electronic entities through the system, for at each stage of amplification or modulation a new duplicate of the input is made; the input signals are dissipated and lost and do not join or become part of the output signals. The net effect of defendant's electronic processing is to transmit through defendant's coaxial cables to its subscribers reproduced signals on new carrier waves.

The vacuum tubes in each active or energized electronic unit in defendant's systems produce in the flow of locally supplied electric current a reproduction or duplication of the voltages that were originally supplied to the grid of each vacuum tube as the input signals. The action of the vacuum tubes controls the flow of locally supplied electrical energy and thereby forms a reproduction of the input signals on new carrier waves. This control of the local electrical power is basically the same when a transistor is used in place of a vacuum tube.

The intelligence of the performance of a telecast moving picture—consisting of sight and sound as transduced and embodied in the amplitude and frequency variations in the energy of the input signals—is reproduced and duplicated electronically by creating precisely corresponding variations in the new current flowing through the vacuum tubes. The conveyance of the intelligence is effected by reproducing the variations in elec-

trical quantities in the form of output signals, while the input signals arriving at the tubes are dissipated in the form of heat.

Reproduction, as herein used, covers the electronic process whereby the patterns, arrangements and configurations of variations and fluctuations of electrical energy which flow into instruments in defendant's systems are used to form on newly supplied energy the same basic patterns, arrangements and configurations. The fact that defendant's systems duplicate and reproduce on newly supplied energy the patterns, arrangements, configurations, variations and sequences of energy that originated from the broadcast antenna is the essential feature of defendant's act of electronic reproduction.

Each of the basic electronic units of defendant's head end—whether a WCON convertor, a Teletrol demodulator or modulator, or a Channel Commander—creates at its output, by means of locally supplied electrical energy, an electronic reproduction or replica of the input signal in the same general manner as an amplifier.

A new amplitude modulated picture carrier wave and a new frequency modulated sound carrier wave reproduced by the head end equipment—representing the sights and sounds of the programs received—are transmitted by defendant in the form of electromagnetic waves propagated within a coaxial cable, i. e., the transmission lines of defendant's systems, to the homes of the subscribers.

It is appropriate at this point to consider certain basic facts concerning the reception at the subscribers' homes. In the home television receiving set, two modulated carrier waves are reproduced by amplification at the radio frequency, that is, at the frequency at which each modulated carrier wave was broadcast. Both carrier waves are then converted (by a convertor or mixer) to a lower frequency, called the intermediate frequency, by a reproductive process called heterodyning. After new carrier waves have been reproduced at the intermediate frequency, these new carrier waves pass

to the input of the demodulator or detector. In the reverse process of demodulation, the entire audio and video signals are dissipated in the form of heat. There is no tearing off, stripping or taking off the intelligence in a physical sense.

The reproduced video signal is utilized to activate the picture tube. The "sync" controls the scan by the electron beam in the picture tube. The inside of the face of the picture tube is covered with a photosensitive substance; and the scanning of the picture tube by the electron beam controlled by the video signal produces varying gradations of light on the coating of the picture tube. Thereby, the picture which is viewed on the home television receiver's screen is created.

The reproduced audio signal activates a loudspeaker which converts the electromagnetic energy into sound.

Since an electronic reproduction or replica of the input signals takes place, the output signals received by the television set are similar, but not identical, to the original broadcast signals.

Having set forth certain technological facts concerning the home receiving sets, the court now resumes its statement of facts describing defendant's systems.

To transmit, propagate and distribute the signals throughout the Fairmont and Clarksburg systems, defendant employs a network of coaxial cables, amplifiers, convertors and taps. In Fairmont, a trunkline cable 225,000 feet in length and, in Clarksburg, one 400,000 feet in length extend from the head end building and proceed along utility poles down from the mountain.

Trunkline amplifiers and other devices are inserted at regular intervals along the trunkline to "amplify" the energy.

Distribution or feeder cables, 436,000 feet in length in Fairmont and 550,000 feet in length in Clarksburg, also carried on utility poles, extend and branch off from the truckline.

Distribution amplifiers and other electronic devices are also mounted on utility poles at necessary intervals in conjunction with the distribution cable. There are approximately 5,000 poles used in each system.

Smaller dimensioned pieces of cable—referred to as "house drop" cable, aggregating 900,000 feet in length in Fairmont, and 1,000,000 feet in length in Clarksburg—extend from "tap-offs" on the distribution cable and terminate on the subscribers' premises, where a connection is made to the subscribers' television sets.

There are approximately 5,000 to 6,000 tap-offs in the Fairmont system, and 8,000 to 9,000 tap-offs in the Clarksburg system.

In most cases, at the end of the coaxial cable on the subscriber's premises there is a piece of equipment called a "matching transformer," whose function is to transform the energy to the proper impedence so that the home sets will operate properly.

There is an aggregate of 665 miles of coaxial cable and 1,017 amplifiers in both systems.

There are approximately 2,000 to 3,000 tubes in the distribution and trunkline amplifiers for both systems—1,000 to 1,500 tubes for each system as compared to approximately 150 tubes in the transmitter of a 100 kilowatt broadcasting station and approximately the same number in the transmitter of a 316 kilowatt broadcasting station. In the five Teletrol units used in the head end of each system, there were approximately 130 tubes.

In the Clarksburg and Fairmont systems, there are 601 and 416 trunk and distribution amplifiers respectively. The average cost of these amplifiers would be approximately $100 each. The cost for the 601 and 416 amplifiers in each system would be $60,000 for the Clarksburg system and $40,000 for the Fairmont system.

There is an aggregate of 250 strand miles in the two systems. The cost for all of the equipment, cables, amplifiers and other line distribution equipment and the installation thereof is approximately $3,000 to $4,000 per strand mile.

Based on these figures, the combined cost of these distribution systems, excluding antennas and head end equipment, would be between $750,000 and $1,000,000.

A coaxial cable is a transmission line or wave guide for the purpose of transmitting electromagnetic energy from one point to another. It consists of an outer metal conductor; an inner metal conductor; and, in between the two conductors, a non-conducting medium known as a dielectric.

The electromagnetic waves reproduced by the electronic equipment at the head end of defendant's systems are fed into the coaxial cable and propagate within and along the cable through the dielectric space between the two conductors at very high velocity. The purpose of the cable is to guide the propagation of the electromagnetic field along the cable and prevent its radiating or spreading out into space over the countryside.

As the electromagnetic waves propagate through the coaxial cable, they lose intensity and, therefore, they must be amplified repeatedly to make sure that, at all points, the signal level is sufficiently high to be useable by the subscribers.

Defendant's systems convert the higher band channels (7–13) to the lower band channels (2–6) in the VHF range. The following chart reflects the channel number on which the signal of each station was received, converted, where applicable, and retransmitted in each of defendant's systems.

| Station | Clarksburg Antenna System | Fairmont Antenna System |
|---|---|---|
| KDKA, Channel 2 Pittsburgh | 2 | 2 |
| WTAE, Channel 4 Pittsburgh | 4 | 4 |
| WJPB, Channel 5 Weston | 4 (3/1/64 to 4/4/64) | 4 (1/3/61 to 1/28/61) |
| | 5 (4/4/64 to 5/1/64) | 4 (3/1/64 to 4/4/64) |
| | | 5 (4/4/64 to 5/1/64) |
| WJAC, Channel 6 Johnstown | 6 | 6 |
| WTRF, Channel 7 Wheeling | 4 (up until 11/1/58) | 4 (up until 11/1/58) |
| | 3 (11/1/58 to 5/1/64) | 3 (11/1/58 to 5/1/64) |
| WSTV, Channel 9 Steubenville | 6 (up until 11/1/58) | 6 (up until 11/1/58) |
| | 5 (11/1/58 to May 1960) | 5 (11/1/58 to May 1960) |
| | 6 (May 1960 to 4/4/64) | 6 (May 1960 to 5/1/64) |
| WIIC, Channel 11 Pittsburgh | 6 (11/1/58 to May 1960) | 6 (11/1/58 to May 1960) |
| | 5 (May 1960 to 12/8/62) | 5 (May 1960 to 4/4/64) |
| WBOY, Channel 12 Clarksburg | 5 (12/8/62 to 4/4/64) 6 (4/4/64 to 5/1/64) | |

An electromagnetic field is real, physical and measurable. A reproduction of an electromagnetic wave is a physical reproduction of a physical reality.

In physical science, mass and energy are equivalent in the sense that one can be converted into the other in accordance with the famous equation "$E = Mc^2$", in which "E" is energy, "M" mass, and "c" the velocity of light. Similarly, it is possible to describe the sensations of sight and sound and electromagnetic signals into which such sight and sound have been transduced as different phases of the same reality. They differ only in that they are different forms of interconvertible energy.

For the reason that the information or intelligence of the sight and sound is the same as that embodied in their respective AM and FM carrier waves, and for the further reason that such sight and sound and such AM and FM carrier waves are readily interconvertible in either direction of transformation, such AM and FM carrier waves are, in substantial and material factual respects, equivalents of the sight and sound.

Defendant's systems are not passive antennas. They consist of sophisticated, complex, extremely sensitive, highly expensive equipment, especially constructed and designed to reproduce the electromagnetic waves received from the originating television station and to propagate and transmit the new electromagnetic waves through an elaborate network of coaxial cables. The term "passive" signifies a device which does not add energy to any of the signals being handled by the system. In that sense, only the antenna and the cable are passive. All of the other equipment, such as the preamplifiers, "Teletrol" demodulators and modulators, WCON converters, "Channel Commanders" and line and distribution amplifiers, used by defendant's systems at various times, are active, not passive.

The intensity of the electromagnetic waves as received at defendant's antenna is insufficient to enable them to travel along the coaxial cable to the subscribers and to produce an acceptable or viewable picture without the reproduction of the signals received on new locally supplied energy at higher intensity by defendant's elaborate electronic equipment.

The Clarksburg and Fairmont systems could not be operated without amplifiers. If it were connected directly to defendant's antennas, a home set located more than 1,500 feet from any of those antennas could not obtain satisfactory signals without such intervening transmission equipment, whether coaxial cable or twin lead is used. The intervening transmission equipment is essential, for without it defendant's systems would not work.

*Nature, function, design and purpose of defendant's CATV systems compared with other television program distribution systems*

Four typical distribution systems are used to extend television service:

(1) Regularly licensed television broadcast stations receive the signals of other television stations by direct off-the-air reception or by a coaxial cable or microwave link system from a network originating source and then distribute the signals by rebroadcasting them;

(2) UHF translators receive and rebroadcast signals from television stations;

(3) VHF repeater stations receive broadcast signals by a superior receiving installation, and amplify and retransmit them;

(4) CATV systems receive, process and distribute signals by coaxial cable to their subscribers.

The electronic processes and equipment employed by all of these distribution systems for the reception, reproduction and transmission of the electromagnetic waves representing television programs originated by other television stations or network studios are basically the same in purpose, function and design. Each of them employs substantially the same complex combinations of amplifiers, detectors or modulators, frequency convertors, and attendant devices designed to accomplish the purpose of receiving,

reproducing and retransmitting the electromagnetic waves representing television programs originated by other stations or network studios.

The basic purpose of defendant's CATV systems, like the basic purpose of other distribution systems, is to process and retransmit signals of a television broadcast station to areas in which direct reception by ordinary home antennas of such television broadcast is unsatisfactory because of distance, intervening topographical conditions, or similar factors.

Defendant's systems, with respect to each channel received, perform a function substantially identical to that of a network affiliated station, UHF translator, or VHF repeater in that they all not only receive but also retransmit signals originated elsewhere.

In preparing the received signals for retransmission, the head end equipment in defendant's systems creates new modulated carrier waves. This was particularly apparent in those instances where Teletrol units were used to create new AM carrier waves. The process by which defendant's systems create new modulated carrier waves from the received signals is electronically the same as the modulating process performed by a television station, a translator and a repeater station in order to transmit received signals.

The head end equipment in each of defendant's systems could operate as a low-power television transmitter in a television broadcasting station.

The dominant, over-all function and design of defendant's systems at all times—regardless of the individual instruments or specific equipment used from time to time—were and are aimed at the objective of propagating electromagnetic energy for the purpose of transmitting TV program material to a large number of subscribers, who are, in effect, their audience. In view of the foregoing characteristics, defendant's systems are, in material respects, analogous to television stations, translator and repeater stations.

Defendant's systems are communication systems for the reasons that they were designed and engineered to, and do, convey information from one location to other locations.

Transmitting signals through the air and transmitting signals through a coaxial cable are equivalent in electronic terms. The same kind of electromagnetic field is transmitted and both types of transmission are manifestations of the working of precisely the same set of physical laws (Maxwell's equations). In the case of a transmission over the air, an electromagetic field is radiated from the transmitter antenna. In the case of a transmission by coaxial cable, an electromagnetic field is formed within the space in the cable between the metal conducting elements of the cable and is propagated along the cable in that interior space. Only the boundary conditions are different in the two cases. If the outer sheath of the cable were removed, the electromagnetic field would propagate in all directions through the air and there would be a low-power telecast.

The ultimate output of defendant's head end, like that of a television transmitter, consists of electromagnetic waves.

Closed circuit television, like CATV, uses coaxial cables for the transmission of the signals.

When a television station telecasts from magnetic tape or from film, no visual images or sound are seen or heard in the studio; and the station does not reproduce within its system any perceivable sight or sound except on monitors. Insofar as sound and sight are concerned, there is no difference between television transmission through the air and CATV transmission: in both systems sound and sight are unobservable by the unaided human senses.

When a station affiliated with a network receives signals either by coaxial cable or off the air, it amplifies and modulates the signals and then transmits the newly created signals, usually without making any tape of the signals. Similarly, when defendant's systems receive,

reproduce and retransmit a program no tape of the signals is made.

Predominantly and primarily, the operations of defendant's systems are auxiliary and complementary to television broadcasting.

Defendant's systems could and did transmit messages with its video scanner. It thus could and did originate a telecast of a message as an originating broadcast station would do. The video scanner converted a fixed scene contained on a slide into a video voltage similar to those derived from a television camera.

Defendant's systems, with but slight modification, had the capacity to originate programs from film or tape. The sending of a message by the use of a scanner constituted the operation of a television transmitting station.

Some CATV systems have the capacity to, and do, originate and send out weather reports from their own head end systems.

Like a network affiliated station, the head end of defendant's systems could receive electromagnetic signals directly from a microwave link and coaxial cable system and retransmit them through its coaxial cables to its subscribers.

*Defendant's proposed findings of fact*

To the extent that defendant's proposed findings are inconsistent with the facts set forth in the preceding pages of this opinion, those proposed findings are rejected as either irrelevant or contrary to the weight of the credible and reliable evidence. The following instances are illustrative.

The fact that the charges by defendant to its subscribers were made solely on the basis of the contracts with them is irrelevant. Defendant's operations constitute copyright infringements regardless of how the charges are levied, whether monthly, yearly, per program or otherwise. With respect to motion picture photoplays, the infringing public performance need not even be for profit. With respect to motion pictures other than photoplays, it is sufficient for a finding of infringement that the performance be "for profit"—without any requirement that a special charge be made for the performance of a particular copyrighted work.

Similarly, it is irrelevant that defendant's systems do not rent, sell or repair television receiving sets for subscribers, or that the subscribers buy and own their television receiving sets on their own premises and arrange and are responsible for maintenance and repair thereof. The unauthorized performances by defendant's systems of plaintiff's copyrighted motion pictures constitute infringements regardless of who owns and controls the TV sets on which the pictures are seen.

Likewise, it is irrelevant that the subscribers to defendant's systems make the decisions as to when and whether the subscribers' receiving sets are turned on or off.

Another irrelevant fact is that defendant's community antenna systems make no separate charge to subscribers related to whether or not a subscriber's set is turned on, or whether or not a subscriber views any particular program. Defendant's operations constitute infringement of copyright even though no separate charge is made to subscribers related to whether or not a subscriber's set is turned on or whether or not a subscriber views any particular program. The decisive fact is that defendant has performed copyrighted works publicly and for profit by the transmission of electromagnetic waves representing the sights and sounds of said works.

Defendant's proposed findings are misleading in that they fragmentize their comparisons into isolated technical components instead of analyzing the systems and their essential function as a whole. The basic function of defendant's complex distribution systems is to receive, reproduce, transmit and perform television programs over an elaborate communication network whereas the home set serves its purpose when it receives the program. The home set does not create new carriers for transmission whereas the heart of defendant's systems is its head end which contains complex equipment for the purpose of adding energy to and processing

and preparing the signals for transmission through a coaxial cable, all in a manner wholly dissimilar to that of the connecting line between the ordinary homeowner's antenna and the home receiver. Hundreds of amplifiers are required to transmit the signals to defendant's subscribers. Without such equipment defendant's systems could not work. If it be assumed, therefore, contrary to all economic reality, that 9,000 home-owners in Clarksburg and 6,000 home-owners in Fairmont could each erect a giant tower on the highest mountain miles away from town, a wire or cable from such antenna without head end equipment and live amplifiers could not conduct the signals beyond 1,500 feet.

Defendant's proposed findings are subject to the criticism that they create the erroneous impression that defendant's systems are substantially similar in function to an ordinary homeowner's antenna installation. The fact that homeowners' antenna installations "may" include amplifiers and convertors—although they rarely do—has little probative value as to the nature of defendant's systems and does not disprove reproduction and performance by defendant. Amplifiers and convertors are also used in television transmitters. This fact, however, does not excuse a television station from liability in the event of an unauthorized broadcast of a copyrighted work.

## II.

Having stated the material facts, the court now considers the basic legal issue: whether the operations of defendant's CATV systems infringe any of the exclusive rights bestowed upon plaintiff by the Copyright Act.[6]

*The crucial issue*

■ The crucial question which this court must answer has been reduced, by a process of distillation, to whether defendant's CATV systems have infringed upon plaintiff's exclusive right "to perform"[7] its copyrights works under section 1(c) and (d).[8] As to that issue, the court finds and concludes that defendant has infringed, is infringing and threatens to continue to infringe plaintiff's exclusive rights to perform the copyrighted moving pictures specified in the complaint, which rights were and are granted to plaintiff by 17 U.S.C. § 1(c) and (d)

---

6. See generally Caldwell, Piracy of Broadcast Programs, 30 Colum.L.Rev. 1087 (1930); Chaffee, Reflections on the Law of Copyright (pts 1 & 2), 45 Colum.L. Rev. 503, 719 (1945); Cole, Community Antenna Television, The Broadcaster Establishment, and the Federal Regulator, 14 American Univ.L.Rev. 124 (1965); Doerfer, Community Antenna Television Systems, 14 Fed.Comm.B.J. 4 (1955); Epstein, Copyright Protection and Community Antenna Television Systems, 12 Bull. Copyright Soc. 147 (1965); Fritch, Some Copyright Implications of Videotapes, 37 So.Cal.L.Rev. 214 (1964); Huntley & Phillips, Community Antenna Television: A Regulatory Dilemma, 18 Alabama L.Rev. 64 (1965); Kaplan, Publication in Copyright Law: The Question of Phonograph Records, 103 U.Pa. L.Rev. 469 (1955); Keller, Is Community Antenna Television a Copyright Infringer?, 43 U.Detroit L.Rev. 367 (1966); Kupferman, Rights In New Media, 19 Law & Contemp.Prob. 172 (1954); Nimmer, The Nature of The Rights Protected By Copyright, 10 U.C.L.A.L.Rev. 60 (1962); Solinger, Unauthorized Uses of Television Broadcasts, 48 Colum.L.Rev. 848 (1948); Comment, 29 Albany L.Rev. 321 1965); Comment, 20 Albany L.Rev. 69 (1956); Casenote, 31 Brooklyn L.Rev. 186, 189 (1965); Comment, 53 Cal.L.Rev. 1378 (1965); Note, 52 Georgetown L.Rev. 136 (1963); Note, 79 Harv.L.Rev. 366 (1965); Note, 51 Iowa L.Rev. 366 (1966); Casenote, 23 Md.L.Rev. 365 (1963); Note, 40 Notre Dame Lawyer 311 (1965); Casenote, 19 Rutgers L.Rev. 426 (1965); Casenote, 43 Texas L.Rev. 810 (1965); Comment, 18 U.Chi.L.Rev. 757 (1951).

7. The court finds it unnecessary, for purposes of this decision, to make any distinction between the word "perform" as it appears in 17 U.S.C. § 1(c) and § 1(d) (1964).

8. Defendant has not taken the position that, if it is found "to perform," such performances are not "public" or "for profit." Therefore, the court does not find it necessary to discuss those issues in detail. For the record, the court finds and concludes that defendant's performances were "public" and "for profit."

(1964); and the court further finds and concludes that defendant's activities in the conduct of its business are not within the privileged scope of any license, express or implied, in fact or in law.

In thus completely upholding plaintiff with respect to the issues litigated in the first stage of the trial, the court does not deem it necessary to subscribe to all of plaintiff's claims in their full sweep. Plaintiff has charged defendant with infringing conduct violative of not only plaintiff's exclusive performing rights granted under section 1(c) and (d) but also of plaintiff's exclusive rights under section 1(a) and of those numerous rights under section 1(c) and (d) in addition to the right to perform. Although some of plaintiff's arguments as to these additional rights are not without force,[9] the court does not think it appropriate to

address itself to the questions raised by them. The potential ramifications of an adjudication of those additional issues are so far-reaching that the court will not pass on them where such a determination is not necessary to a disposition of the case at bar. The ends of justice are best served by the court's limiting its decision to the issue of whether defendant has infringed plaintiff's performing rights.

*Defendant's arguments*

Defendant's arguments in support of its contention that it has not infringed plaintiff's exclusive right to perform may be summarized as follows:[10]

1. Defendant merely provides a reception service. It simply makes available to subscribers a connection to a master antenna facility. Its CATV systems serve the same function as a private

9. E. g., the argument based upon the impressive testimony of plaintiff's expert (see e. g., Trial Record at 633, 748, 750, 751, 752, 755 and 756) that defendant's CATV systems store information (i. e., program intelligence) in the coaxial cables during the time the audio and video signals are being propagated through the cables; that "the physical reality of the electromagnetic field containing the sights and sounds of the program is every bit as real as a piece of paper with print on it or of a photograph" (Id. at 752); and that the storage of electromagnetic energy in CATV coaxial cables and on videotape is basically the same. Upon the foregoing testimony, plaintiff argues that one of plaintiff's exclusive rights is to make a transcription or record "by or from which, in whole or in part, it [the copyrighted work] *may* in any manner or by any method be exhibited, performed, represented, produced, or reproduced" (emphasis supplied); and that defendant made such transcriptions and records of plaintiff's copyrighted motion pictures in the course of its CATV operations.

10. The following arguments have been advanced for and against the exemption of CATV from copyright infringement liability in any revision of the Copyright Act. They are of interest because they mirror the arguments, pro and con, presented to this court with reference to CATV's liability for copyright infringement under the present Copyright Act:
   "The arguments advanced in support of an outright exemption of transmis-

sions by CATV can be summarized as follows:
   (1) A CATV system does nothing more than to provide its subscribers with a service for improving their television reception. Home viewers are entitled to free reception and, since the cost of copyright royalties would necessarily be passed onto the individual CATV subscribers, copyright control would discriminate between those viewers who need no special equipment and those who do.
   (2) A community antenna operator has no control over the content of the broadcasts he passes on to his subscribers, and does not even know in advance what works will be performed in the broadcasts. To obtain blanket clearances in advance would be virtually impossible, and the establishment of a clearinghouse system large enough to insure against multiple suits for copyright infringement would result in a giant monopoly of copyright owners.
   (3) Performance royalties now being paid by broadcasters include compensation to copyright owners for further transmission to CATV subscribers, since those royalties are based on the size of the ultimate audience receiving the broadcast, including those subscribers. Community antenna operators actually benefit copyright owners today by expanding the advertising revenue of broadcasters, and hence the copyright royalties paid by them. To require

receiving antenna and that function is wholly dissimilar from that of a broadcasting station and from that of any entertainment system, e. g., Muzak. It provides the use of an antenna which television viewers require for home reception.

2. The electromagnetic waves broadcast by the television stations and received by defendant are not rendered audible or visible at any point within the CATV systems—with the sole exception of those rare instances where monitors are used for testing purposes.

3. To the extent that a "performance," if any, occurs at places other than at the broadcasting stations, it occurs only within the confines of the subscriber's home through the instrumentality of the subscriber's privately-owned and operated receiver and through the exercise of the subscriber's discretion as to what programs, if any, will be viewed.

4. The operative words of the Copyright Act are all transitive verbs whereas defendant's activities can be described only in intransitive terms. An antenna system cannot "perform" a copyrighted film. It can be used only to assist subscribers in receiving the originator's performance.

5. The legislative history of the Copyright Act indicates that when the draftsmen used the word "perform," they had in mind the model of a stage performance, i. e., the presentation of visual and aural impressions immediately to an audience.

6. Defendant's systems and operating equipment are non-infringing because they do not originate, broadcast or rebroadcast programs or change the signals which are broadcast from and originate with the television stations. The CATV subscriber sees the same program that is seen by a television set owner whose antenna is capable of receiving the signals broadcast by a television station.

further payment would constitute an unwarranted double reward.

Balanced against these arguments are those of a wide range of interests, including copyright owners such as authors, publishers, and motion picture companies, together with broadcasting networks and local broadcasters. Their arguments can be summed up as follows:

(1) A community antenna system is much more than a 'passive device' or service. It is an extremely complex transmission system which does essentially what a broadcaster does: it transmits television programs to the public. It not only takes a free ride on what the broadcaster has produced, but it does something the broadcaster does not do: it makes a direct charge to the public for the reception of its transmissions. If a theater owner piped broadcasts of copyrighted material into a theater and charged the public directly to see them, there could be little doubt as to his copyright liability; the CATV operator does exactly the same thing, the only difference being that his audience is not assembled in one place.

(2) Community antenna systems effectively deprive the copyright owner of control over his work. In many cases (for example, motion pictures or syndicated series) where the broadcasting of

a work is licensed for a particular limited territory and audience, a CATV transmission of the broadcast to subscribers in another area can mean the actual loss of the market for broadcasts of the work in that other area. Multiplied many times throughout the country, this loss can be very serious.

(3) The many hundreds of community antenna systems are prosperous business enterprises which neither need nor deserve a free ride at the expense of copyright owners, or in competition with local broadcasters, wired music services, and other users who must pay royalties for similar uses. The activities of the CATV operators constitute a 'clear moral wrong' comparable to the old practice of 'bicycling' movies from one theater to another in order to get two performances out of one license. CATV shows signs of changing the face of broadcasting in this country, and as new patterns emerge it is essential that the copyright owner's rights be protected."
Copyright Law Revision, Part 6, Supplementary Report of the Register of Copyrights on the General Revision of the U. S. Copyright Law: 1965 Revision Bill, Printed for use of the House Committee on the Judiciary, 89th Cong., 1st Sess. at pp. 41-2 (Comm.Print May, 1965).

7. Defendant has no control over which of the available television signals the subscriber uses. It has no way of knowing what programs a subscriber elects to view on his own television receiving set. Nor does it care how much use the subscriber makes of the signals it makes available to him because it charges a flat monthly rate which does not vary with the amount of use the subscriber makes of his television set. There is no separate charge for viewing any particular television program.

8. A CATV system is not a rebroadcaster. A rebroadcaster radiates the signals received from a network onto the public airways in all directions by means of a broadcasting transmitter and antenna whereas a CATV system conducts the signals received by its passive antenna to the subscriber's receiver by means of coaxial cables.

9. No judicial authority extends the copyright owner's performance right to apply to an antenna service which (a) does not originate the copyrighted work or does not broadcast, in the sense that the term is used in the radio and television industry; and (b) does not own or control the apparatus on which the "performance" is rendered audible or visible.

10. There is an implied in law license sanctioning CATV systems' activities and immunizing them against liability to pay copyright royalties.[11]

To the extent that the foregoing arguments by defendant are based upon asserted facts inconsistent with those found and set forth in the preceding pages by the court, such factual contentions are rejected. To the extent that the foregoing arguments by defendant are predicated upon legal propositions contrary to those found to be controlling by the court in the course of this opinion, such legal contentions are likewise considered to be untenable.

*Analysis of the problem of statutory interpretation*

■■ The rights asserted by plaintiff are derived solely from the Copyright Act. Consequently, the court's primary task is one of statutory interpretation. That task requires the court to give meaning to a word appearing in a Congressional enactment and not merely to ascertain on a show of hands what definition laymen would give the same word when used in ordinary conversation. The role of the court in interpreting statutory words is not the same as that of the dictionary editor. The desiderata guiding each are of a different order.

The court must decide whether the realities of the situation dictate a conclusion that defendant's activities fall inside the line on the spectrum which separates those acts which must be held to be beyond the scope of the copyright statute from those which must be held to be within the statute's purview. For purpose of analysis, the realities of the present situation may be considered in terms of (a) linguistic realities, (b) technological realities and (c) economic realities. These categories are, of course, not mutually exclusive; there is a degree of overlap.

A. Linguistic realities

On the premise that words are only the means of communicating thoughts or ideas, it may be contended, with a degree of validity, that the words "to perform," as commonly used in everyday speech by the average layman, are not intended to encompass the aggregate or composite of the acts of (1) receiving electromagnetic waves embodying a broadcast performance, which were propagated into the air by a television broadcaster; (2) amplifying and reproducing them; and (3) transmitting the resultant reproductions

---

11. Particularly significant is the fact that a number of the arguments presented by defendant herein have already been advanced in other cases at the trial court level and expressly rejected at the appellate level. See, e. g., Buck v. Duncan, 32 F.2d 366 (W.D.Mo.1929), reversed sub nom. Buck v. Jewell-La Salle Realty Co., 51 F.2d 726 (8th Cir. 1931) ; Jerome H. Remick & Co. v. American Auto. Accessories Co., 298 F. 628 (S.D.Ohio 1924), reversed, 5 F.2d 411 (6th Cir.), cert. denied, 269 U.S. 556, 46 S.Ct. 19, 70 L.Ed. 409 (1925).

of those electromagnetic waves by means of coaxial cables so that subscribers can utilize their TV sets to see and hear the reproductions of the broadcast performance. Assuming arguendo that contention to be correct, however, it does not follow that the words "to perform," as used in the Copyright Act, cannot or should not be construed to encompass the above-described acts.

A word never has only one meaning. It takes color and character from its surroundings and means different things in different contexts. The meaning of a word is dynamic, not static, because it alters with the passage of time; *i. e.*, the thoughts or ideas that a given word is utilized to convey change with time.

■ In interpretating a statutory provision, the court must attribute to the operative word used that one of its meanings which accords most closely with the intention of the enacting legislature and with the underlying purpose which led the legislators to choose that particular word.

Manifestly, Congress could not have had any specific intent with regard to CATV systems when it enacted the Copyright Act for the reason that CATV is a relatively recent development.[12] That, however, is not to say that CATV is outside the purview of the Copyright Act. In a cognate case, the Court of Appeals for the Sixth Circuit stated the proposition as follows:

"While the fact that the radio was not developed at the time the Copyright Act * * * was enacted may raise some question as to whether it properly comes within the purview of the statute, it is not by that fact alone excluded from the statute. In other words, the statute may be applied to new situations not anticipated by Con-gress, if, fairly construed, such situations come within its intent and meaning. * * * While statutes should not be stretched to apply to new situations not fairly within their scope, they should not be so narrowly construed as to permit their evasion because of changing habits due to new inventions and discoveries.

"Bills have been introduced in both House and Senate to permit broadcasting without infringing copyrights. The rights of composer, producer, performer, and the public under this new method of reproduction are eminently matters for considered legislation; but, until Congress shall have specifically determined the relative rights of the parties, we can but decide whether and to what extent statutes covering the subject-matter generally, but enacted without anticipation of such radical changes in the method of reproduction, are, fairly construed, applicable to the new situation." Jerome H. Remick & Co. v. American Auto. Accessories Co., 5 F.2d 411–412 (6th Cir. 1925), reversing, 298 F. 628 (S.D.Ohio 1924), cert. denied, 269 U.S. 556, 46 S.Ct. 19, 70 L.Ed. 409 (1925). See Metro-Goldwyn-Mayer Distributing Corp. v. Bijou Theatre Co., 59 F.2d 70, 76 (1st Cir. 1932); Edison v. Lubin, 122 F. 240, 242 (3d Cir. 1903).

■■ That the words of a statute must be so construed as to effectuate the purpose and intent underlying the legislation is axiomatic. Equally established is the proposition that a court must tread carefully lest it step beyond that gossamer line which sometimes separates proper judicial interpretation from judicial usurpation of the legislative function. While the road is well traveled, the signposts are not always as clear as the perplexed pilgrim would wish.[13]

12. The first commercial television license was granted in 1941. Ettore v. Philco Television Broadcasting Corp., 229 F.2d 481 n. 3, 58 A.L.R.2d 626 (3d Cir.), cert. denied, 351 U.S. 926, 76 S.Ct. 783, 100 L.Ed. 1456 (1956). The pioneer commercial radio broadcasting station was erected in 1920. Buck v. Jewell-La Salle Realty Co., 283 U.S. 191, 196 n. 2, 51 S.Ct. 410, 75 L.Ed. 971 (1931).

13. Compare cases such as White-Smith Music Publishing Co. v. Apollo Co., 209 U.S. 1, 28 S.Ct. 319, 52 L.Ed. 655 (1908); and Capitol Records, Inc. v. Mercury Records Corp., 221 F.2d 657, 660 (2d

In determining the definition and scope of a word appearing in a statute, the court must first envisage its paradigm image—the picture which naturally and normally comes to mind upon hearing that word used. Then it must mentally create a spectrum of variations upon that theme with the paradigm image at its center. The point on the spectrum at which a court will say that a particular phenomenon is outside the scope of the statute will be a function of the court's conception of the objective sought to be achieved by the legislature as the result of the enactment of the statute; the court's judgment as to whether the inclusion of the particular phenomenon in question would promote the underlying legislative purpose; and, the court's judgment as to whether such inclusion would be reasonable in that it would not lead to an absurd, unfair or shocking result. This process, of necessity, entails the exercise of the court's judgment.

In determining whether to do that which defendant does is "to perform," the court must ascertain the content of the word "perform" as it is used in the statute.

Perhaps the paradigm image of a performance, i. e., something which all would agree is exemplary of what the word performance is used to connote, occurs when Sir Laurence Olivier delivers Hamlet's soliloquy from the stage of a theatre at which there is an audience in attendance. All of the classic elements of a performance, as that word is used in common parlance, are then and there present: (1) an actor; (2) a work to be acted; and (3) an audience present to immediately see and hear the actor. From the time of the ancient Greeks, these triune elements indubitably would be said to constitute a performance of the playwright's work.

There is little doubt, however, that no such unanimity would result from a query addressed to average laymen as to whether there is a performance by one who retransmits electromagnetic waves to subscribers from which a reproduction of a broadcast performance can be transduced.

Justice Holmes' oft quoted epigram is apposite:

"A word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used." Towne v. Eisner, 245 U.S. 418, 425, 38 S.Ct. 158, 159, 62 L.Ed. 372 (1918).

Allusion has been made to the classical conception of a performance as involving a player acting out a work in the immediate presence of an audience. The inclusiveness of this classic conception no longer holds true. The contemporary revolution in the science and technology of mass communication—a revolution generally recognized as profound as the invention of the printing press—has, in reality, altered the content of the concept "to perform." It is now not only within the realm of possibility, but, indeed, it is the prevalent mode of performance for the work to be rendered in a place physically or geographically apart from the place where the intended audience perceives and enjoys the performance.

Modern mass telecommunication technology has caused what was once coalesced in the term "performance" to be conceptually and factually separable into its three components. This triad consists of (1) the rendition by the actor; (2) the method of communicating the rendi-

Cir. 1955) ; and Corcoran v. Montgomery Ward & Co., 121 F.2d 572 (9th Cir.), cert. denied, 314 U.S. 687, 62 S.Ct. 300, 86 L.Ed. 550 (1941), where the courts deferred to the presumed intent of Congress because the issue before the courts had been known to Congress when it amended the Copyright Act with cases such as Jerome H. Remick & Co. v. American Auto. Accessories Co., 5 F.2d 411 (6th Cir.), cert. denied, 269 U.S. 556, 46 S.Ct. 19, 70 L.Ed. 409 (1925), where the phenomenon in question had not been in existence the last time Congress had amended the Copyright Act. Cf. Patterson v. Century Productions, Inc., 93 F.2d 489, 493 (2d Cir. 1937), cert. denied, 30? U.S. 655, 58 S.Ct. 759, 82 L.Ed. 1114 (1938).

tion to the audience; and (3) the method by which the audience is enabled to perceive an audible and/or visible reproduction of the original rendition. All three elements are integral parts of today's "performance." Conceptual difficulty arises only when there is a lapse in our recognition of the effect the communications revolution has had on the concept of "performance" and when our thinking regresses to the time when the three component elements of a performance could be viewed as one without any danger of telling only a part of the story.

In what we have referred to as a classical performance, there was direct communication between the players or actors and an audience that was physically present. What has happened as a result of the new techniques of communication is that there has been a physical separation of the audience from the original or primary performance. The audience destined to enjoy the performance is usually not present when the primary performance takes place. The players, musicians or actors often perform in an empty studio. If the performance is recorded on a phonograph record, videotape or film, a secondary performance is communicated to a remote audience. Instead of the performance occurring instantaneously in the presence of a live audience, the secondary performance is delayed. It is transmitted and possibly retransmitted to a multiplicity of audiences; and the method by which the secondary performance takes place is no longer face to face, but by means of sight and sound made available either by wires, records, films or broadcast electromagnetic waves, etc. The techniques of communication may vary, but all of them serve one purpose: to bridge the gap that science has created between the original performers and the audience.

When a CATV system brings the acting or the playing to the audience and makes available to that audience a reproduction of a primary performance (as embodied in the phonograph record, the magnetic tape, or the film, etc.), it is executing a function that is so closely akin in result to the primary performance of the copyrighted work that, for purposes of protecting the copyright proprietor's performance monopoly, the court finds that it should treat the situation as if there were a classical performance and attach to it the consequences resulting from an unauthorized primary performance. There can be no doubt that there are physical differences, but they arise out of differences in technique of communication—not in what is being transmitted and what is ultimately seen and heard by the viewing public.

B. Technological realities

The technological realities involved in the operation of a CATV system demonstrate that it is not merely a passive antenna service. The court has found that defendant's CATV systems do not simply receive telecast signals and pass *those* signals on to its subscribers. To the contrary, defendant's CATV systems not only receive the telecast signals but also electronically process them. What defendant passes on to its subscribers are not the same signals that were received but electronic reproductions of them, containing, however, the same program information or intelligence.

Defendant emphasizes the undisputed fact that a telecast received on defendant's systems is not visible or audible at any point within defendant's systems; but it is visible and audible only on the television sets of defendant's subscribers. That plaintiff's copyrighted motion pictures are not visible or audible until they reach the subscriber's television sets emphasizes, rather than contradicts, the essential similarity between a CATV system and a broadcasting station and the dissimilarity between a CATV system and a home receiving set. Indeed, except in the comparatively rare instances where a broadcasting station has a live performance in its own studio, there is nothing visible or audible at the broadcasting station. Even when a broadcasting station originates programs by transducing motion picture films or videotapes into electromagnetic energy, there is nothing visible or audible to an observer

at the station. The projection of the film in a television studio is on a small photosensitive surface within a camera tube. The fact that in CATV operations, as in the case of a broadcasting transmission, nothing is visible or audible in the process of transmission demonstrates the dissimilarity between CATV and a home receiver, on the one hand, and the similarity between CATV and a broadcasting station, on the other.

It is incorrect to say that all broadcasting stations convert sight and sound into electromagnetic energy. Only when a "live" performance is originated in the studio do sight and sound exist as such. In those instances, the sight and sound is converted, i. .e, "transduced," into electromagnetic energy. In many other instances, broadcasting stations such as network affiliates, independent local stations, translators, repeater stations and satellite stations, merely retransmit electromagnetic energy received by them from the originating station in the same manner as CATV receives and retransmits electromagnetic waves—the only significant difference between such broadcasting stations and CATV being that broadcasting stations transmit through the air while CATV transmits through cables. Neither in the case of CATV nor in the case of such network affiliates, local stations, translators, repeater stations and satellite stations is anything which may be seen or heard converted into electromagnetic energy by the process of transduction.

By the technique of transduction, sounds and images are originally converted into precisely corresponding audio and video signals representing the same program information or intelligence as the sounds and images. Otherwise stated, the very same information or intelligence is embodied in two different but interconvertible forms of energy. Both forms of energy function as technological equivalents in the sense that each represents a "manner" in and "method" by which one may "perform," within the meaning of section 1(c) and (d) of the Copyright Act.[14]

### C. Economic realities

The economic realities involved in the operation of a CATV system demonstrate that defendant is in the business of selling television programs to the public. Contrary to defendant's contentions that it merely makes available electromagnetic waves and not performances, the subscriber is willing to pay for defendant's service only because he gets that which he desires—television programs, not simply electromagnetic waves. Admittedly, the means of delivering the performance is novel—by the propagation of electromagnetic waves through a coaxial cable—but the performance itself is the salable commodity.

Moreover, it is apparent that in certain circumstances, defendant's CATV systems do, in a very real sense, perform the same function as broadcasters or rebroadcasters and are in direct competition with them for audiences. They are

14. The interconvertibility of electromagnetic waves and sight and sound is today a technological commonplace. Additional illustrations are reported daily. See, e. g., (1) The Radio Corporation of America "Speech Recognition System," which "takes a voice, breaks it down into symbols that are transmitted over wires and then reconstructs them back to voices" (N. Y. Times, March 30, 1966, p. 57, col. 7) ; (2) A General Electric communication system that uses modulated laser pulses to transmit data which are then converted at the receiver into electric signals and read out in useful form (N.Y.Times, April 2, 1966, p. 32, col. 2); (3) The Wollensak VTR-150 videotape recorder that records and plays back pictures and sound on magnetic videotape. (Minnesota Mining And Manufacturing Company, Report to Shareholders, April 28, 1966); (4) The SONY "Videocorder" that records pictures and sound on magnetic videotape (N.Y.Times, March 4, 1966, p. 43, col. 5); (5) "Voiceprinting", "an electronic method of representing the human voice pictorially," for purposes of identification (N.Y. Times, April 12, 1966, p. 1, col. 2; April 13, 1966, p. 55, col. 8); and (6) The Xerox "Magnafax" that transmits and receives documents through simple acoustical coupling with conventional telephones (Xerox Corporation 1965 Annual Report, p. 24).

a means of making available a reproduction of a primary performance to an audience; and that is perhaps the economic justification for the existence of CATV systems as well as broadcasters and re-broadcasters.

*Pertinent judicial authorities*

Denominating as a performance only the rendition by the actor is, today, not only descriptively inaccurate in fact, but is not in accord with judicial usage with respect to the Copyright Act.

Prior decisions have foreclosed the argument that the only performance occurs at the studio where the actor emotes. See, e. g., Buck v. Jewell-La Salle Realty Co., 283 U.S. 191, 197–198, 51 S.Ct. 410, 75 L.Ed. 971 (1931). Defendant, however, would have the court find that there is no other "performance" until the homeowner switches on his television set; and that, therefore, one who—like defendant—stops short of the last act necessary to produce an audible and visible reproduction of the broadcast performance cannot be charged with having performed. The court finds that position contrary to the teachings of the relevant case law.

Although the precise question now presented for adjudication is one of novel impression,[15] the decided cases indicate both a trend and a general philosophy that have assisted the court in resolving the issues before it.

Two lines of cases involving the broadcasting phenomenon are discernible. One line of cases deals with the liability of the broadcaster; the other with the liability of the recipient of a broadcast. When radio broadcasting was in its infancy, a number of ingenious arguments were advanced, both by broadcasters and those who made commercial use of the broadcasts they received, in support of their contention that they were free to make commercial use of copyrighted works without subjecting themselves to amercement.

A. Cases dealing with liability of broadcasters

At what may be described as a rudimentary phase in this line of decisions, a radio broadcaster caused an unauthorized live performance of a copyrighted opera to be given in its studio without an audience being present. The court rejected the argument that the "performance" was private and not "public," and held the broadcaster liable as an infringer. Messager v. British Broadcasting Co., [1927] 2 K.B. 543, reversed on other grounds, [1928] 1 K.B. 660, aff'd, [1929] A.C. 151. Similarly, when a radio broadcaster, without authorization, caused a singer accompanied by an orchestra to perform a copyrighted song in its studio, which performance it then broadcast, the broadcaster was held to have performed the copyrighted work publicly for profit in violation of the Copyright Act. Jerome H. Remick & Co. v. American Auto. Accessories Co., 5 F.2d 411 (6th Cir.), cert.. denied, 269 U.S. 556, 46 S.Ct. 19, 70 L.Ed. 409 (1925). See also M. Witmark & Sons v. L. Bamberger & Co., 291 F. 776 (D.N.J. 1923). And this court had little difficulty in reaching a similar result even when the playing of a phonograph record was substituted for a live performance. Associated Music Publishers, Inc. v. Debs Memorial Radio Fund, 46 F.Supp. 829, 831 (S.D.N.Y. 1942), aff'd, 141 F.2d 852 (2d Cir.), cert. denied, 323 U.S. 766, 65 S.Ct. 120, 89 L.Ed. 613 (1944).

---

15. While it is true that the case at bar is the first one presenting the precise issue before the court for adjudication, the CATV phenomenon has come before the courts in other contexts. See, e. g., Carter Mountain Transmission Corp. v. Federal Communications Commission, 116 U.S.App.D.C. 93, 321 F.2d 359 (D.C.Cir.), cert. denied, 375 U.S. 951, 84 S.Ct. 442, 11 L.Ed.2d 312 (1963); Lilly v. United States, 238 F.2d 584 (4th Cir. 1956); Cable Vision, Inc. v. KUTV, Inc., 211 F. Supp. 47 (D.Idaho 1962), rev'd and remanded, 335 F.2d 348 (9th Cir. 1964), cert. denied sub nom. Klix Corp. v. Cable Union, Inc., 379 U.S. 989, 85 S.Ct. 700, 13 L.Ed.2d 609 (1965); Intermountain Broadcasting & Television Corp. v. Idaho Microwave, Inc., 196 F.Supp. 315 (D. Idaho 1961).

B. Cases dealing with liability of broadcast recipients

Perhaps the leading case dealing with the liability of one who makes commercial use of a broadcast performance is the Supreme Court's decision in Buck v. Jewell-La Salle Realty Co., 283 U.S. 191, 51 S.Ct. 410, 75 L.Ed. 971 (1931) (Brandeis, J.) (hereinafter *"Buck"*).

In a previous decision, the Supreme Court had held that a hotel which hired an orchestra to play dinner music in its dining room for its guests' pleasure, and another hotel which hired singers who were accompanied by an orchestra, infringed the copyright proprietors' exclusive right to perform in public for profit despite the fact that no separate charge was levied for listening to the music. Herbert v. Shanley Co., 242 U.S. 591, 37 S.Ct. 232, 61 L.Ed. 511 (1917). Mr. Justice Holmes, speaking for the Court, said:

> "If the rights under the copyright are infringed only by a performance where money is taken at the door, they are very imperfectly protected. Performances not different in kind from those of the defendants could be given that might compete with and even destroy the success of the monopoly that the law intends the plaintiffs to have. It is enough to say that there is no need to construe the statute so narrowly." Id. at 594, 37 S.Ct. at 233. Compare Lerner v. Schectman, 228 F.Supp. 354, 358 (D.Minn.1964).

In the *Buck* case, the Court was presented with a situation where a hotel accomplished precisely the same result condemned in Herbert v. Shanley Co., supra, albeit by another method. Instead of hiring an orchestra and singers, the hotel used radio music to entertain its guests.

The LaSalle Hotel maintained a master radio receiving set which was wired to each of the hotel's public and private rooms. As part of the service offered to its guests, loudspeakers or headphones were provided so that a program received on the master set could be simultaneously heard throughout the building. A radio broadcaster, *without authorization*, broadcast a performance of a copyrighted song which was received by the hotel on its master radio receiving set and made available to its guests. The District Court, 32 F.2d 366 (W.D.Mo.1929), held that such acts did not constitute a "performance" within the meaning of the Copyright Act; and the Circuit Court certified the following question to the Supreme Court:

> " 'Do the acts of a hotel proprietor, in *making available* to his guests, through the instrumentality of a radio receiving set and loud speakers installed in his hotel and under his control and for the entertainment of his guests, *the hearing of a copyrighted musical composition* which has been broadcast from a radio transmitting station, *constitute a performance* of such composition *within the meaning of 17 USC Sec. 1(e)?'* " 283 U.S. at 195–196, 51 S.Ct. at 410–411 (Emphasis added.)

The Court answered the certified question affirmatively.

The defendant in the *Buck* case advanced a number of arguments in support of its position that it had not "performed" within the meaning of the Act. Among other contentions, it urged that it had not performed because there can be but one actual performance each time a copyrighted selection is rendered; and that, if the broadcaster is held to be a performer, one who merely receives and distributes the transmitted selection cannot also be held to have performed it. Announcing what has since come to be known as the "multiple performance doctrine," the Court rejected the hotel's argument by saying:

> "But nothing in the act circumscribes the meaning to be attributed to the term 'performance,' or prevents a single rendition of a copyrighted selection from resulting in more than one public performance for profit. While this may not have been possible before the development of radio broadcasting, the novelty of the means used does not lessen the duty of the courts to give

full protection to the monopoly of public performance for profit which Congress has secured to the composer. * * * No reason is suggested why there may not be more than one liability." 283 U.S. at 198, 51 S.Ct. at 411.

In a highly revealing statement of the Court's view of the flexibility of the concept "to perform," the Court stated that, in a situation such as the one then before it, "public reception for profit in itself constitutes an infringement" of the copyright proprietor's exclusive right to perform. Ibid.

The hotel in the *Buck* case, supra, also presented a technical electronics argument in an effort to prove that there was no performance because the reception of a radio broadcast is no different from listening to a distant rendition of the same program; that is, a radio is electronically simply the equivalent of an ear-trumpet which enables one to hear a distant performance. The Supreme Court rejected that argument as factually inaccurate. In electronics terms, the music heard on a radio receiving set was recognized as being an electronic reproduction of the original music which was broadcast and not the original music itself. The Court found that the process of receiving a radio broadcast and then translating it into audible sound is different from merely hearing the original music. It is reproducing the original music; and the resulting electronic reproduction constitutes a performance within the meaning of the Copyright Act. 283 U.S. at 199–201, 51 S.Ct. 412–413.

In interpreting the word "perform," as it is used in the Copyright Act, the Supreme Court made it plain that, particularly in a field of rapid technological change, courts must not be intimidated by the dictionary. Attention must be turned to the substance of the matter; courts must give the statutory words a meaning consonant with the realities of the situation. In determining whether the hotel's acts constituted a performance, the Supreme Court regarded as significant the fact that:

"There is no difference in substance between the case where a hotel engages an orchestra to furnish the music and that where, by means of the radio set and loud-speakers here employed, it furnishes the same music for the same purpose." 283 U.S. at 201, 51 S.Ct. at 412.

The next case in this line is Society of European Stage Authors and Composers, Inc. v. New York Hotel Statler Co., 19 F.Supp. 1 (S.D.N.Y.1937) (Woolsey, D.J.) (hereinafter "*SESAC*").

In the *SESAC* case, the hotel had installed for its guests' listening pleasure what was denominated "a two channel radio system." It consisted of two master radio receiving sets, amplifying apparatus and a cable from which distribution lines were connected to loudspeakers in the hotel's nineteen hundred individual guest rooms. A guest could, while in his own room, manipulate a switch in much the same manner in which one uses an ordinary radio to hear radio broadcasts. However, the selection of programs available to him was limited to the two that were being received on the hotel's two master receiving sets.

A witness, apparently an agent of the plaintiff, checked into the hotel and subsequently testified that he heard plaintiff's copyrighted song by means of the loudspeaker in his room, which was connected to the hotel's two master receiving sets.

The facts in *SESAC* differed from those in the *Buck* case, supra, in three respects. First, the audible reproduction of the broadcast performance took place only in the individual guest rooms and not in any of the hotel's public rooms—a consideration relevant primarily to the issue of whether the performance, if any, was "public." Second, the radio broadcasting station was authorized to broadcast the copyrighted work—a consideration relevant to the issue of the existence of an implied license in favor of the hotel. Third, the defendant hotel did not perform the last act necessary to retransduce the electromagnetic waves into an audible reproduction of the broadcast perform-

ance; that is, it was the guest who turned the knob on the device in his room when he desired to hear a radio program. This latter consideration was relevant to the issue of whether the acts of the hotel were sufficient for the court to characterize it a performer within the meaning of the Copyright Act—the same issue posed by the case at bar.

Despite the fact that the hotel's acts stopped short of producing an audible reproduction of the broadcast performance, Judge Woolsey found them sufficient to constitute a performance within the meaning of the Copyright Act. The problem presented in *SESAC* differs from the problem presented for adjudication in the case at bar only in degree and not in kind. This court must likewise decide whether the acts of defendant—despite the fact that they stop short of producing an audible and visible reproduction of the broadcast performance—are sufficient to constitute a performance within the meaning of the Act.

Judge Woolsey rejected the argument that liability for an unauthorized performance exists only when defendant performs the last act necessary to convert the electromagnetic waves it receives into an audible reproduction of the broadcast performance. He said:

"This argument is based on the theory that it is only the last step which counts.

I do not agree to that principle as here applied * * *." 19 F.Supp. at 4.

Rather than feeling compelled to give its sanction to the thwarting of the underlying purpose of the Copyright Act by means of a narrow construction of the statutory words, the court interpreted the Supreme Court's decision in the *Buck* case, supra, as a mandate that it look through the form to the substance and give the word "perform," as it appears in the Copyright Act, a realistic construction:

" * * * I find that when the owner of an hotel *does as much as* is done in the Hotel Pennsylvania to promote the reproduction and transmission within its walls of a broadcast program received by it, it must be *considered as* giving a performance thereof within the principle laid down by the Supreme Court in the La Salle Hotel case." 19 F.Supp. at 4–5. (Emphasis added.)

A cognate case is Harms, Inc. v. Sansom House Enterprises, Inc., 162 F.Supp. 129 (E.D.Pa.1958), aff'd sub. nom. Leo Feist, Inc. v. Lew Tendler Tavern, Inc., 267 F.2d 494 (3d Cir. 1959), where the court said:

"Defendants have pressed the fact that this case is of first impression as to the particular form of infringement here alleged. For that matter, it seems to be conceded that there has been no prior decision as to infringement by the present means, *i. e.*: copyrighted musical compositions played on transcription discs, transmitted by leased telephoned [sic] wires to customers who purchase such music service, and who amplify such music on loudspeakers in their several places of business without permission of the copyright owners.

The circumstance of the novelty of the combination of mechanical means involved, however, does not appear to vary the principles established in the three cases heretofore cited [Herbert v. Shanley Co., supra; *Buck*, supra; and *SESAC*, supra]. For that matter, the numerous cases of musical infringement under the act involve infinite combinations of means of musical performance. The principles applied, however, are those of the same leading cases, despite the individual differences as to where and how the music is produced, transmitted, and made audible. e. g . Irving Berlin, Inc., v. Daigle, 5 Cir., 1929, 31 F.2d 832; Buck v. Coe, D.C.M.D.Pa. 1940, 32 F. Supp. 829; Harms v. Cohen, D.C.E.D. Pa. 1922, 279 F. 276; Buck v. Heretis, D.C.E.D.S.C. 1928, 24 F.2d 876; M. Witmark & Sons v. Calloway, D.C.E.D. Tenn. 1927, 22 F.2d 412." Id. at 133–134.

The *Harms* case is distinguishable from the case at bar by the facts that de-

fendant Muse-Art (the analytical analog of CATV) produced an audible rendition of the copyrighted music when it played the transcription disc (phonograph record) in its studio, and that the subscriber made unauthorized commercial use of the reproduction of the original performance in its tavern, arguably making Muse-Art a *contributory* [16] infringer. Nevertheless, the *Harms* case is of significance for present purposes because it expressly recognized that, once it is determined that a defendant has "performed" within the meaning of the Copyright Act, the novelty of the method which he employs is irrelevant to the issue of liability.

C. Cases dealing with liability of rebroadcasters

Plaintiff calls to the court's attention a line of cases which have been termed "rebroadcaster cases," [17] and contends that they stand for the proposition that there is no necessity that defendant give an audible and/or visible performance of the copyrighted work in order "to perform" within the meaning of the Copyright Act. While the court finds those decisions more than compatible with the result it reaches in the case at bar, it does not read those decisions to *necessarily* stand for that proposition. Since, in each case, there appears to have been both an unauthorized audible and/or visible performance in the studio of the originating broadcaster and privity between the originating broadcaster and the affiliated rebroadcasters, see the *Buck* case, supra, 283 U.S. at 197 n. 4, 51 S.Ct.

at 411, it was not necessary in those cases to decide whether the acts of the rebroadcasters, standing by themselves, constituted an infringing performance. The words "separate and independent liability" are quite consonant with a theory of contributory infringement because liability in those cases would be several as well as joint. See generally Ball, Law of Copyright and Literary Property § 154 (1944). The court has not been referred to any case where the issue litigated was the liability of a rebroadcaster when either the original broadcast was authorized and the rebroadcast unauthorized or the original broadcast unauthorized but there was no privity between the original broadcaster and the rebroadcaster. This court neither expresses nor intimates any opinion as to the rebroadcaster's liability in such a state of facts inasmuch as that question is not now before it. Worthy of note, however, is the fact that the rebroadcaster cases do, at the very least, stand for the proposition that, whatever the theory of the rebroadcasters' liability, each broadcast by those affiliated stations resulted in a separate "performance" within the meaning of the Copyright Act.

*The defense based on an implied in law license*

Relying on footnote 5 in the *Buck* case, supra, 283 U.S. at 199, 51 S.Ct. at 412, defendant has argued in the case at bar that there is an *implied in law* license for commercial TV reception and distribution of a telecast performance. [18] While the Supreme Court did not have the ques-

---

16. This interpretation is suggested by the language "liable in damages, *jointly and severally*, for * * * *performances* * * * *at the* * * * *Tavern* * *." 162 F.Supp. at 137. (Emphasis added.) Thus, there was no occasion to determine Muse-Art's liability if its subscriber had not made commercial use of the "broadcast" performance.

17. See, e. g., Davis v. E. I. DuPont de Nemours & Co., 249 F.Supp. 329, 331 (S.D.N.Y.1966); Select Theatres Corp. v. Ronzoni Macaroni Co., 59 U.S.P.Q. 288 (S.D.N.Y.1943); Law v. National Broadcasting Co., 51 F.Supp. 798 (S.D.N.Y. 1943). Cf. Jerome H. Remick & Co. v.

General Electric Co., 16 F.2d 829 (S.D. N.Y.1926), where a radio broadcaster who broadcast an orchestra's unauthorized performance was held liable on a theory of contributory infringement.

18. To obviate any possible confusion, the court points out that the following discussion concerns the possible existence of a license implied in law as opposed to one implied in fact. The court has found and concluded that no credible evidence was adduced at the first stage of the trial which would indicate that defendant was the beneficiary of any license in fact or in law, express or implied.

tion before it in the *Buck* case (because the radio broadcaster, as well as the hotel which used the broadcast for commercial purposes, was unauthorized to do so), the Supreme Court did state that, had the broadcaster been authorized, "a license for its commercial reception and distribution by the hotel company might possibly have been implied." 283 U.S. at 199 n. 5, 51 S.Ct. at 412. The Court suggested a comparison to Buck v. Debaum, 40 F.2d 734 (S.D.Cal.1929).

In the *Debaum* case, supra, the District Court held that the owner and operator of a café, who played an ordinary radio set so that his patrons could hear and enjoy the programs, did not infringe a copyright proprietor's exclusive right to perform when he made available broadcasts of copyrighted music to his patrons.

Perhaps the most fruitful way to analyze the Supreme Court's reference to the *Debaum* case is to recognize that the District Court in *Debaum* rested its finding of no infringement on two theories— one of which the Supreme Court overruled and the other of which it did not find necessary or appropriate to consider on the facts then before it. The *Debaum* court's conclusion that the reception of a broadcast of a copyrighted work for commercial purposes cannot constitute a performance because the only performance in such a case takes place in the studio of the broadcasting station was clearly overruled by the Supreme Court. However, the court in *Debaum* also rested its decision on the ground that, when the copyright proprietors "licensed the broadcasting station to disseminate the * * * [copyrighted song,] they impliedly sanctioned and consented to any 'pick up' out of the air that was possible in radio reception." 40 F.2d at 735. The District Court concluded:

> "The owner of a copyrighted musical composition can fully protect himself against any unauthorized invasion of his property right by refusing to license the broadcasting station to perform his musical composition; but, when he expressly licenses and consents to a radio broadcast of his copyrighted

composition, he must be held to have acquiesced in the utilization of all forces of nature that are resultant from the licensed broadcast of his copyrighted musical composition." 40 F.2d at 736.

It is clear that the Supreme Court neither approved nor disapproved of this implied in law license theory in the *Buck* case. Since the broadcast was unauthorized in *Buck*, the Court merely raised the question in passing.

While our Supreme Court has never had occasion to consider the question, the existence of an implied in law license in such a situation would seem to have been rejected in both England and Canada. See Performing Right Society, Ltd. v. Hammond's Bradford Brewery Co., 49 Times Law Reports 410 (Chan. Div. 1933), aff'd, 50 Times Law Reports 16 (Ct. of App. 1933), aff'd, [1934] 1 Ch. 121; Canadian Performing Right Soc. v. Ford Hotel, [1935] 2 Dominion Law Reports 391.

The question being not whether there *is* an implied in law license to perform publicly for profit but rather whether there *should* be, this court holds that there should not. Unlike the District Court in the *Debaum* case, this court cannot find that the copyright proprietor of today "can fully protect himself against any unauthorized invasion of his property right by refusing to license the broadcasting station * * * ." 40 F.2d at 736.

■ Included within the first stage of the trial by force of the court's pre-trial orders is the issue raised by the third separate defense. The gist of this defense, as pleaded in paragraphs "37" and "38" of the answer, is that, under the Federal Communications Act of 1934, 47 U.S.C. §§ 151–609 (1964), as implemented by regulations promulgated by the Federal Communications Commission, "no person may lawfully impose [a] charge upon the reception of commercial television broadcasts and every person is free to receive such broadcasts by the equipment of his choice"; that the commercial television broadcasting stations

referred to in the complaint as having broadcast the plaintiff's motion pictures did so pursuant to license from plaintiff and pursuant to license from the FCC; that the FCC license "precludes a charge to the public for the reception of the broadcasts"; and, hence, "plaintiff seeks by this action to impose an unlawful charge upon the reception by defendant's subscribers of broadcasts by commercial television, and may not recover." A paraphrase of this defense, as pleaded, is that the Communications Act and FCC regulations prohibit plaintiff from collecting copyright royalties from defendant because the Act and regulations make plaintiff's collection of such royalties unlawful.

Having considered defendant's arguments and examined the authorities it cites in support of its third separate defense, the court finds and concludes that there is no merit to that defense. No useful purpose would be served by including in this opinion a detailed exposition of the court's analysis of the contentions advanced by the respective parties. Beyond cavil, neither the policy nor the language of the Federal Communications Act or the regulations promulgated thereunder, nor the reports of the FCC are intended to or have the effect of repealing or modifying section 1 of the Copyright Act. The court finds no basis for concluding that defendant is the beneficiary of any license implied in law.

### III.

Having discussed the facts and the relevant case law, the court now presents its critique and general conclusions.

The court has adverted to the novelty of the issue here posed. The essence of that novelty is embodied in the following question: When is a court justified in construing the copyright proprietor's exclusive right "to perform" to include a situation characterized by these two features; first, the use made of an audible and visible reproduction of an authorized telecast of a performance of a copyrighted work does not infringe the copyright; and, second, he who electronically processes and retransmits the program intelligence enabling the recipient of the audible and visible reproduction of the broadcast performance to receive the reproduction supplies that program intelligence to the public for profit?

The Supreme Court was not called upon to consider that precise question in *Buck*. That case concerned the now relatively simple situation where the recipient (e. g., the hotel) of an audible reproduction of a performance makes it available to the public for profit rather than receiving it for its own private enjoyment. While few lay observers in 1931 would have thought the hotel a "performer" in any ordinary sense of the word, the Supreme Court chose to give the words "to perform" a realistic interpretation that would prevent the dilution of the copyright proprietors' performance monopoly by means of an electronically produced substitute for a live performance. That interpretation, of course, was in accord with the intent Congress manifested when it utilized in section 1(c) and (d), the words "to perform * * * *in any manner or by any method whatsoever * * *.*" (Emphasis added.) The ineluctable implication of those words is that Congress envisaged more than one means of achieving the proscribed end.

The *SESAC* case presented the more difficult "in between" question because there the hotel's acts arguably stopped one step short of providing a substitute for a live performance. The act of a third party—the guest—was necessary before an audible reproduction of the broadcast performance could be heard. But the guest was the intended audience —the member of the public to whom the reproduction of the original performance was made available as part of the services for which he paid. The court found the fact that the guest rather than an employee of the hotel switched on the receiving device to be less significant than the fact that a substitute for a live performance had been made available to the public for profit.

In Canadian Admiral Corp. v. Rediffusion, Inc., [1954] Can.Exch. 382, the

court found that defendant's CATV system "supplies radio and television programs to its subscribers," id. at 402, and that such acts constitute a "performance" within the meaning of the Canadian Copyright Act, id. at 404, despite the fact that there is an express provision in that Act limiting the definition of a "performance" to "any acoustic representation of a work or any visual representation of any dramatic action in a work, including a representation made by means of any mechanical instrument or by radio communication * * *." Id. at 403.[19]

That court likewise did not find significant the fact that the last act necessary to convert the electromagnetic waves into an audible and visible "representation" of the copyrighted work was not done by defendant's CATV system. However, the court did find that the "performances" which took place in the homes of the subscribers, although attributable to the defendant's CATV system, did not meet the requirement of the Canadian Copyright Act that they be performances "in public." Id. at 408. Those "performances" which took place in defendant's CATV system's showroom were found to constitute infringing performances. Id. at 409. Compare, e. g., Jerome H. Remick & Co. v. American Auto.

Accessories Co., supra, 5 F.2d at 412; SESAC case, supra, 19 F.Supp. at 5; Messager v. British Broadcasting Co., supra, [1927] 2 K.B. at 548–49.

When the Supreme Court in *Buck* and the District Court in *SESAC* characterized the respective defendants' acts as violative of the copyright proprietors' exclusive right to perform, they were discharging the traditional judicial function of interpreting statutory provisions.

The updating of statutory language to accommodate it with current technological advances is part of the genius of our law to adapt and to grow.[20] The achievements of modern science and technology surpass the imagined marvels of the philosopher's stone and Aladdin's lamp. The practical necessities of such an age require judicial recognition of the contemporary meaning of the words of the Copyright Act. This is simply a matter of statutory interpretation in accordance with traditional canons. In discharging this responsibility of statutory interpretation, the court neither usurps the legislative function nor exercises the power of reappraisal and adaptation of judge-made common law based upon common law concepts. Cf. United States v. Freeman, 357 F.2d 606 (2d Cir. 1966).

19. Compare our Copyright Act which contains no built-in prescription as to the definition of the word "perform", thus, a fortiori, indicating an intention that our courts are to conform the definition of the word "perform" to the linguistic, technological and economic changes in the scope of that concept.

20. For a well-known example of this process, see Attorney-General v. Edison Tel. Co., [1880] 6 Q.B. 244, where a telephone was construed to be a telegraph within the meaning of a statute. See generally Cohen, Law and the Social Order 132–34 (1933); 2 Sutherland, Statutory Construction § 5102 (3d ed. 1943).

This process of statutory interpretation is a judicial application of the principle of semantic extension. See generally Bloomfield & Newmark, A Linguistic Introduction to the History of English 352–57 (1963); Baugh, A History of the English Language 372–81 (2d ed. 1957); Chase, The Tyranny of Words 316, 327 (1938); Cohen, Law and the Social Order

133–34 (1933); Frank, Courts on Trial 293–94 (1949); Greenough & Kittredge, Words and Their Ways in English Speech 263 (Beacon Paperback ed. 1962); Hayakawa, Language In Thought and Action 55–56, 60, 65 (1949); Lehmann, Historical Linguistics: An Introduction 198–99 (1962); Lloyd & Warfel, American English In Its Cultural Setting 40–41 (1956); Nist, A Structural History of English 409 (1966); Chaffee, The Disorderly Conduct of Words, 41 Colum.L.Rev. 381, 390, 394, 396, 399–400, 402, 404 (1941); Fries, Usage Levels and Dialect Distribution, American College Dictionary xxv (1962); Hanley, Synonyms and Antonyms, American College Dictionary xxiii (1962); Probert, Law, Logic and Communication, 9 W.Res.L.Rev. 129, 139–40 (1958); Rubin, Observations on the King's English, 9 Brooklyn Barrister 246, 249 (1958).

As to the semantic history of the words "broadcast," "movie" and "photoplay," see Hayakawa, supra, 55–6; Mencken, The American Language 187, 197 (4th ed. 1936).

**214**

It is hardly conceivable that Congress intended the statute to be read with a strangling literalness so as to require it to be amended on a month-to-month basis as the means of keeping pace with science and technology. The responsibility of keeping the Copyright Act a living law devolves primarily, though not exclusively, upon the courts whose traditional function of statutory interpretation and construction, if effectively performed, will achieve in great measure the desirable objective of accommodating the statute to the realities of modern science and technology. The courts may not avoid the discharge of this responsibility by blandly treating the problem as one within the legislative domain nor may the problem be swept under the rug by expressing the hope that some day some executive agency will be created and assigned the task of updating the statute as an administrative function.[21]

■ Accordingly, the court has approached the problem as one falling within the traditional judicial task of statutory interpretation. The discharge of that function of statutory interpretation is in no way a usurpation of the function of the legislature. The fundamental difference is between preventing a new means of accomplishing an old and proscribed end from diluting or decreasing the scope of the monopoly Congress has granted to the copyright proprietor—a function of the courts—and, on the other hand, expanding the scope of that monopoly—which only the Congress can legitimately do.

The court is presented with a situation where the copyright proprietor collects royalties when a local broadcaster makes the electromagnetic waves available to the home television set owner but receives nothing when a CATV system does the same thing. Recognition of the expanded scope of the concept "to perform" in the one case, by a parity of reasoning, suggests such recognition in the other.

■ The court holds that when a CATV system, for profit, plays so substantial a part in a reproduction of a broadcast performance being seen and heard by the public that the only act necessary to transduce the electromagnetic waves it has processed and transmitted to subscribers into an audible and visible reproduction of the broadcast performance is a minor, albeit essential, one—such as "turning the knob" on a homeowner's television set—the CATV system must be said to have infringed upon the exclusive right to "perform" which Congress has bestowed upon the copyright proprietor in 17 U.S.C. § 1(c) and (d). In so holding, the court believes that it adopts a construction of section 1 that recognizes contemporary scientific realities, takes into consideration the current technologies of the television industry, effectuates the predominant purpose and policy of the statute, and gives the language of the Act a meaning consonant with the trend of interpretative decisions in cognate fields.[22]

■ The court notes in passing that, despite the fact that exemptions from

21. See, e. g., observations of Professor Benjamin Kaplan made in his third Carpentier Lecture delivered at Columbia Law School, March 19, 1966, reprinted as Kaplan, An Unhurried View of Copyright: Proposals and Prospects, 66 Colum.L.Rev. 831, 847 (1966); and the suggestion of Professor Melville B. Nimmer appearing in Hearings before Subcommittee No. 3, Part 3, House Committee on the Judiciary, 89th Cong., 1st Sess. at pp. 1815–16 (1965).

22. Compare the similar conclusion reached by the Register of Copyrights in the course of his inquiry into the question of whether CATV should be granted a statu-

tory immunity in the proposed revision of the Copyright Act:

"On balance, however, we believe that what community antenna operators are doing represents a performance to the public of the copyright owner's work. We believe not only that the performance results in a profit which in fairness the copyright owner should share, but also that, unless compensated, the performance can have damaging effects upon the value of the copyright. For these reasons, we have not included an exemption for commercial community antenna systems in the bill."

Copyright Law Revision, Part 6, Supplementary Report of the Register of Copy-

inclusion within the copyright proprietor's performance monopoly may arguably be desirable in certain instances purely on policy grounds, such desiderata are for Congress and not the courts.[23]

Once the court has determined, as it has herein, that a defendant's activities constitute a public performance for profit within the meaning of the Copyright Act, it has no discretionary power to except that defendant from the coverage of the Act. Only Congress can legitimately do that. See *Buck,* supra, 283 U.S. at 199, 51 S.Ct. at 412.

In summary, the court concludes:

1. With respect to plaintiff's copyrighted motion pictures other than photoplays, defendant has infringed upon plaintiff's copyrights by performing plaintiff's said copyrighted motion pictures in public for profit. 17 U.S.C. § 1 (c) (1964).

2. With respect to plaintiff's copyrighted motion pictures which are photoplays, defendant has infringed upon plaintiff's copyrights by performing plaintiff's said copyrighted motion pictures publicly. 17 U.S.C. § 1(d) (1964).

3. The Federal Communications Act of 1934, 47 U.S.C. §§ 151–609 (1964), does not prohibit plaintiff, as copyright proprietor, from collecting royalties from defendant's CATV systems for their public performance of plaintiff's copyrighted motion pictures.

4. Neither the Federal Communications Act of 1934, 47 U.S.C. §§ 151–609 (1964) nor the broadcasting licenses from the Federal Communications Commission to the television stations in Pittsburgh, Steubenville and Wheeling nor the contractual licenses from plaintiff to said television stations operate as licenses which would authorize defendant to perform plaintiff's copyrighted works without plaintiff's consent.

The court grants plaintiff's motions (1) for an interlocutory decree and order as to the issues tried in the first stage of the trial, and (2) to strike and dismiss the third separate defense on the merits. The court denies defendant's motion for a decree and order dismissing the complaint.

So ordered.

rights on the General Revision of the U. S. Copyright Law: 1965 Revision Bill, Printed for use of the House Committee on the Judiciary, 89th Cong., 1st Sess. at p. 42 (Comm. Print May, 1965).

23. Compare Copyright Law Revision, Part 6, Supplementary Report of the Register of Copyrights on the General Revision of the U. S. Copyright Law: 1965 Revision Bill, Printed for use of the House Committee on the Judiciary, 89th Cong., 1st Sess. at p. 42 (Comm. Print May, 1965), where the Register of Copyrights rejected the suggestion of any exemption for commercial CATV systems in the proposed bill, with Letter From Robert W. Kastenmeier, Acting Chairman, House Copyright Subcommittee No. 3, House Committee on the Judiciary, to Hon. Harley O. Staggers, Chairman, House Committee on Interstate and Foreign Commerce, May 5, 1966, where the suggestion was made that CATV activities should be divided into categories with liability dependent upon the category within which a CATV system's activities fall.

As to the economic, administrative and legislative problems created by the impact of CATV on the television industry, see, e. g., F.C.C., First Report on Microwave Relays, April 23, 1965, Pike & Fischer, 4 Radio Reg.2d 1725 (1965); F.C.C., Report and Order—Inquiry Into the Impact of Community Antenna Systems, TV Translators, TV "Satellite" Stations, and TV "Repeaters" on the Orderly Development of Television Broadcasting, 26 F. C.C. 403, Pike & Fischer, 18 Radio Reg. 1573 (1959); F.C.C., Sixth Report and Order on Television Allocations, April 14, 1952, Pike & Fischer, 1 Radio Reg. at page 91:601 (1952); VHF Booster and Community Antenna Legislation, Hearings, Communications Subcommittee, Senate Committee on Interstate and Foreign Commerce, 86th Cong., 1st Sess. (1959); Note, 79 Harv.L.Rev. 366 (1965).